PANTEX TOWING CORPORATION, a corporation, Plaintiff-Appellant,

v.

Thomas GLIDEWELL, Seafarers International Union of North America, Atlantic Gulf, Lakes and Inland Waters District, AFL–CIO, an unincorporated association, Defendants-Appellees.

No. 84–7304.

United States Court of Appeals, Eleventh Circuit.

June 21, 1985.

Joseph F. Danner, Darby & Myrick, P.C., Mobile, Ala., for plaintiff-appellant.

J. Randall Crane, Mobile, Ala., for defendants-appellees.

* Honorable Homer Thornberry, U.S. Circuit Judge for the Fifth Circuit Court of Appeals,

Before GODBOLD, Chief Judge, ANDERSON, Circuit Judge, and THORNBERRY *, Senior Circuit Judge.

THORNBERRY, Senior Circuit Judge:

Appellant, Pantex Towing Corporation (Pantex), brought suit against the Seafarers International Union of North America, Atlantic, Gulf, Lakes and Inland Waters District, AFL-CIO (SIU) and Thomas Glidewell, SIU's port agent, alleging that defendants had committed admiralty torts resulting in economic loss to Pantex. The district court granted appellees' motion for summary judgment and dismissed Pantex's action on the grounds that Pantex was collaterally estopped by a prior decision of the NLRB. We affirm in part, reverse in part, and remand.

## FACTS AND PROCEDURAL HISTORY

Pantex operated the tugboat MV HANNAH and the barge PANTEX 2003. The HANNAH and the barge plied Mobile Bay and connecting waterways for the purpose of loading, transporting, and unloading oil at shore-based refineries.

From December 1979 through January 1980, the SIU, through its port agent and union organizer, Thomas Glidewell, conducted a campaign to organize the employees on board the HANNAH. On January 9, 1980, after Glidewell had secured signed union authorization cards from many of Pantex's employees, Glidewell contacted a Pantex official and informed him that the Union represented a majority of the nonsupervisory employees aboard the HANNAH and that it would like to negotiate a contract. On January 11, Pantex refused to recognize and bargain with the SIU.

The events that form the basis of this lawsuit occurred on January 11 and 12, 1980. On the afternoon of January 11, the HANNAH and the PANTEX 2003 were at

sitting by designation.

the Ergon oil terminal at the east bank of Mobile Bay loading oil. Between 5:00 and 6:00 p.m. Glidewell boarded the HANNAH carrying signs that stated:

Unfair, Pantex Towing Company refuses to recognize the SIU as bargaining agent for its non-supervisory personnel, whose tugs and/or barges are at the water site of this site. We have no dispute with any other company. Seafarers International Union of North America, AGLIWD, AFL-CIO.

On board the HANNAH at that time were relief captain Denton, pilot Colley and two other crew members—Fitts and Ammons. After some discussion in which Glidewell told the men that Pantex had refused to bargain with the Union, the men agreed to a work stoppage. Colley and Ammons then took up signs and picketed on Pantex property. Captain Denton told Fitts to stay on the HANNAH, maintain the engines, and to keep a security watch. Denton left with Glidewell to telephone Pantex manager, William Odom, and inform him of the work stoppage.

After being informed of the work stoppage, Odom went to the HANNAH with a substitute crew. He found Colley and Ammons on the barge with the signs and ordered them to leave Pantex's property. Both men promptly complied. Fitts was not told to leave and he remained on board. The substitute crew finished loading the barge and the HANNAH and PANTEX 2003 then proceeded up river to the Mobile Bay Refinery at the Port of Chickasaw.

Between 10:00 and 11:00 p.m. that same day, Glidewell and Denton arrived at the Mobile Bay Refinery. They boarded the HANNAH and found Fitts in the galley. Fitts reported the encounter among Odom, Colley, and Ammons. Odom then entered the galley and ordered both Denton and Glidewell off the vessel.

On the evening of January 12 the HANNAH and the PANTEX 2003 were back at the Ergon terminal and the substitute officers and crew were loading oil. Around dark Glidewell and Carr, an off-duty tankerman, boarded the barge and Carr started

picketing. They were soon ordered off the boat by Odom. Although the record is somewhat unclear on this point, it appears that the officers and crew ceased loading operations. Two days later Pantex discharged Denton and Colley for dereliction of duty.

*Administrative Proceedings*

On January 14, 1980, the SIU filed unfair labor practice charges with the National Labor Relations Board (NLRB). On February 29 the Regional Director of the NLRB issued a complaint alleging that Pantex had refused to recognize and bargain with the SIU in violation of § 8(a)(5) of the National Labor Relations Act (the Act), fired Colley because he engaged in protected activities in violation of §§ 8(a)(1) and (3) of the Act, and orally threatened employees and granted a wage increase in violation of §§ 8(a)(1) and (3) of the Act. In June 1980 an administrative law judge conducted a full hearing on the issues. SIU and Pantex were both present and represented by counsel. Pantex defended the claim of unlawful discharge on the grounds that Colley was a supervisor and thus his conduct was unprotected, that Colley had participated in creating an unsafe hazard to the HANNAH, and, that even if Colley were not a supervisor, the discharge was lawful because the work stoppage was not protected activity.

On March 31, 1981, the administrative law judge issued his decision in the case. The judge ruled that Pantex had not violated § 8(a)(5) by refusing to bargain, but had violated §§ 8(a)(1) and (3) by granting a wage increase, by threatening certain employees and by discharging Colley. The judge ruled against Pantex on its defenses, holding that Colley was not a supervisor and had been engaged in protected concerted activity and that no unsafe condition posing a dangerous threat to Pantex's property had been created. Finally, the administrative law judge found that the SIU represented a majority of the Pantex employees aboard the HANNAH, excluding officers, clerical employees, watchmen, and supervisors. Because he found that Pantex's conduct during the SIU's organi-

zational drive "amounted to an all out campaign offensive designed to thwart the organizational rights of its employees," and that the "prospects for erasing the effects of such unlawful conduct and ensuring a fair election by the use of traditional remedies are poor," he recommended that a bargaining order be issued. On September 30, 1981, the NLRB issued an order in the case. *Pantex Towing Corp.*, 258 N.L.R.B. 837 (1981). The Board modified the administrative law judge's decision by finding that Pantex had violated § 8(a)(5) by refusing to recognize and bargain with the Union. Otherwise the Board affirmed the administrative law judge's findings and rulings and adopted the recommended order. Neither Pantex nor the SIU appealed the NLRB's decision.[1]

### The Civil Complaint

On April 8, 1980, while both NLRB cases were pending, Pantex filed this action in the Southern District of Alabama, seeking compensatory and punitive damages for maritime torts allegedly committed by Glidewell and the SIU. Jurisdiction was alleged to be in admiralty.

The complaint contained the following allegations:

9. On January 11, 1980, between 17:00 hours and 18:00 hours, while the HANNAH and her tow, the PANTEX 2003, were moored at the Ergon Terminal on the Mobile River and while the PANTEX 2003 was taking on Venezuelan crude oil from the Ergon Terminal for transportation to the Mobile Bay Refinery at the port of Chickasaw, Glidewell boarded the HANNAH and the PANTEX 2003 and

   a. induced the officers and crew of the HANNAH to cease loading operations;

   b. attempted to cause the officers and crew of the HANNAH to abandon the HANNAH; and,

   c. induced the officers and all but one member of the crew of the HANNAH to abandon the HANNAH.

10. The activities of Glidewell described in Paragraph 9 delayed the departure of the HANNAH and her tow, the PANTEX 2003, for the port of Chickasaw and caused the PANTEX 2003 to sail light.

11. On January 11, 1980, between 21:00 hours and 23:00 hours, Glidewell boarded the HANNAH while the HANNAH was moored at the Mobile Bay Refinery at the port of Chickasaw and, by threats of force, attempted to cause the remaining member of the crew of the HANNAH to abandon the HANNAH and leave the HANNAH unattended.

12. On January 12, 1980, while the HANNAH and her tow, the PANTEX 2003, were moored at the Ergon Terminal and while the PANTEX 2003 was taking on Venezuelan crude oil from the Ergon Terminal for transportation to the Mobile Bay Refinery at the port of Chickasaw:

   a. Glidewell caused the MV Tugboat MARION SMITH to ram the PANTEX 2003; and,

   b. Glidewell, and other persons well known to Glidewell and the S.I.U. but unknown to Pantex, by threats of physical violence forced the officers and crew of the HANNAH to cease loading the PANTEX 2003.

13. The acts of Glidewell described in Paragraph 12 delayed the departure of the HANNAH and her tow, the PANTEX 2003, for the port of Chickasaw.

15. Pantex employed guards to protect the HANNAH, the PANTEX 2003 and the crew of the HANNAH from further unlawful acts of Glidewell and the S.I.U.

16. Pantex employed attorneys to bring about a cessation of the unlawful acts of Glidewell and the S.I.U.

---

**1.** On January 15, 1980, Pantex filed unfair labor practice charges with the NLRB and a complaint was issued on February 29. The complaint alleged that SIU had restrained and coerced Pantex employees by means of oral threats in violation of § 8(b)(1)(A) of the Act. In June 1980, SIU and the NLRB agreed to a unilateral, informal settlement in the case. The charges were settled by an agreement that the SIU would not engage in any future coercive conduct and there was no admission of liability as to the past charges of coercion. The parties agree that the settlement has no collateral estoppel effect on the case before us.

At oral argument of this case the panel requested supplemental briefing to further explain the nature of the maritime torts Pantex is alleging. Pantex's supplemental brief alleges that the defendants engaged in intentional tortious activities on three separate occasions. The claims and allegations made by Pantex may be summarized as follows: In the early evening of January 11 Glidewell trespassed on Pantex's property and set up a trespassory picket line.[2] These tortious acts resulted in a work stoppage and in the abandonment of the HANNAH and thus constituted an intentional interference with Pantex's business operations. Pantex was damaged because the HANNAH sailed late and light. Pantex's brief further alleges that on the night of January 11 Glidewell again trespassed on the HANNAH and threatened Fitts, a Pantex employee, thus intentionally interfering with Pantex's business operations. Pantex claims that on January 12 Glidewell caused the PANTEX 2003 to be rammed by another vessel,[3] trespassed on the PANTEX 2003, engaged in trespassory picketing,[4] and threatened the crew members with violence. By these acts Glidewell and the SIU tortiously induced a second work stoppage and thus intentionally interfered with Pantex's business operations. As a result the HANNAH sailed late and Pantex was induced to breach its afreightment contract with the Mobile Bay Refinery.[5] Pantex sought $12,000 compensatory damages, $100,000 punitive damages, and costs.

The defendants' answer to the complaint asserted two defenses (failure to state a cause of action and lack of subject matter jurisdiction) and alleged two counterclaims. The district court granted a motion by Pantex to strike the defenses as insufficient. On December 17, 1980, the district court stayed this action pending final resolution of the NLRB case. On December 18, 1982,

the court terminated the stay and granted Pantex's motion for partial summary judgment dismissing SIU's counterclaims on the ground that SIU was collaterally estopped by the NLRB decision. On April 6, 1984, the district court granted the SIU's motion for summary judgment on the ground that Pantex was also collaterally estopped by the NLRB decision. The district court then entered final judgment in this action. Pantex appeals from the judgment dismissing its claims. The SIU does not appeal.

## I.

Issues of fact litigated and decided in a prior administrative proceeding may have collateral estoppel effect on issues of fact presented in a subsequent judicial action. The parties agree that when an administrative body has acted in a judicial capacity and has issued a valid and final decision on disputed issues of fact properly before it, collateral estoppel will apply to preclude relitigation of fact issues only if: (1) there is identity of the parties or their privies; (2) there is identity of issues; (3) the parties had an adequate opportunity to litigate the issues in the administrative proceeding; (4) the issues to be estopped were actually litigated and determined in the administrative proceeding; and (5) the findings on the issues to be estopped were necessary to the administrative decision. *United States v. Utah Construction and Mining Co.*, 384 U.S. 394, 421–422, 86 S.Ct. 1545, 1559–1560, 16 L.Ed.2d 642 (1966); *Garner v. Giarrusso*, 571 F.2d 1330, 1335–36 (5th Cir.1978). *See also* 4 K.C. Davis, *Administrative Law Treatise*, Ch. 21 (2d ed. 1983). Pantex contends that the NLRB decision does not estop any of the fact issues in this action because the liability of the SIU and Glidewell for the alleged torts

---

**2.** We note that the complaint itself contains no such allegations of trespassory picketing.

**3.** The complaint does not allege any property damage. Apparently Pantex is alleging only that the defendants rammed the PANTEX 2003 in order to intimidate the crew and coerce a work stoppage.

**4.** *See* note 2, *supra.*

**5.** We note that the complaint does not allege the existence of an afreightment contract.

was not at issue, was not litigated, and was not necessary to the decision in the NLRB case.

We agree with Pantex that the district court erred in holding that Pantex's tort claims are completely barred by the doctrine of collateral estoppel. The NLRB case concerned charges that Pantex had committed unfair labor practices; the conduct of Glidewell and the SIU simply was not at issue in that proceeding. To the extent that Pantex's claims in this action focus on the conduct of the SIU and Glidewell, there is no identity of issues and the claims are not barred.

Appellees argue that the NLRB found that the work stoppage was protected concerted activity and that this finding precludes any action by Pantex seeking damages resulting from the work stoppage. We agree that the NLRB found the work stoppage was protected concerted activity and that this finding was necessary to the decision of the NLRB. One of the administrative charges against Pantex was that it had unlawfully discharged Dewey Colley. Pantex defended the discharge on several grounds, one of which was that by joining in the work stoppage Colley had engaged in unprotected activities on behalf of the SIU. The NLRB rejected this defense, finding that Colley was discharged "because he engaged in protected union and concerted activities." Pantex Towing Corp., 258 N.L.R.B. 837, 846 (1981). This finding was necessary to the decision because Pantex had pleaded and argued the illegality of the work stoppage as a substantive defense to the unfair labor practice charge.

■ The finding that the work stoppage was protected does not, however, bar a common law cause of action for tortiously inducing the work stoppage. A union may be liable for using tortious means to coerce a work stoppage even if the work stoppage itself is protected concerted activ-

ity.[6]  29 U.S.C. § 158(b)(1)(A) (NLRA § 8(b)(1)(A)); *United Automobile, Aircraft and Agricultural Implement Workers of America v. Wisconsin Employment Relations Board,* 351 U.S. 266, 76 S.Ct. 794, 100 L.Ed. 1162 (1956); *Rainbow Tours, Inc. v. Hawaii Joint Council of Teamsters,* 704 F.2d 1443 (9th Cir.1983). The NLRB decided only that the work stoppage was protected; the decision does not contain any findings regarding the legality of Glidewell's or the SIU's actions in organizing the work stoppage. The NLRB also made no findings regarding the employees' motives for entering into the work stoppage. Appellees contend that the NLRB's finding that the group on board the HANNAH on January 11 "agreed with Glidewell's proposal" (Pantex Towing Corp., 258 NLBR 837, 841) to a work stoppage constitutes a finding that the employees entered into the work stoppage voluntarily and not as a result of threats or intimidation by the Union. Even if we were to so construe the NLRB's finding, it would not have collateral estoppel effect because the finding was not necessary to the administrative decision. In order to resolve the issue before it, the NLRB need only have found that the work stoppage Colley participated in was concerted activity and that the object of the work stoppage was protected. It was not necessary to determine Colley's or anyone else's reason or motive for engaging in the work stoppage. Therefore, the fact issues of whether the SIU or Glidewell engaged in tortious activity and whether such activity coerced the Pantex employees into ceasing work are not collaterally estopped by the findings in the prior NLRB decision.

■ Pantex's brief indicates that not only is it seeking damages for the economic losses resulting from the work stoppage but that it also seeks damages resulting from the "abandonment" of the HANNAH and the PANTEX 2003 on January 11 that

---

6. Although the NLRB finding that the work stoppage was protected does not collaterally estop these claims, the legality of the work stoppage may not be relitigated, and the NLRB's

finding will have an effect on this proceeding because of the need to accommodate federal labor policy. *See* Part II, *infra.*

created an unsafe condition and a dangerous threat to Pantex's property. To the extent that Pantex seeks to hold Glidewell and the SIU liable for tortiously inducing such "abandonment" we affirm the district court and hold that the claim is collaterally estopped by the NLRB finding that no unsafe condition was created. In the NLRB case, Pantex urged as a second defense to the claim that it unlawfully discharged Colley that Colley had participated in creating an unsafe condition posing a dangerous threat to Pantex's property. In examining this defense, the administrative law judge made the following findings, subsequently adopted by the NLRB:

> As for Colley's conduct being unprotected because he participated in creating an unsafe condition posing a dangerous threat to Respondent's property, the record clearly fails to support such an assertion. At the inception of the work stoppage orders were issued that the oil line be disconnected and the barge secured, thus, avoiding any possibility of a massive oil spill. Captain Denton ordered Fitts, an experienced engineer and deckhand with 12 years in the industry to stay aboard *Hannah*, maintain the engines, and keep a security watch for the safety of the boat and barges. Colley and Ammons meanwhile were in positions on *Hannah's* barge from which they could oversee *Hannah's* status. The express precautions taken by Denton and the crew to guarantee *Hannah's* safety strongly tend to confirm a genuine regard for the boat, barge, and cargo—a regard also communicated directly to Respondent's manager Odom when Denton and Glidewell left the boat and telephoned Odom assuring the latter that any orders regarding either moving *Hannah* or with respect to her further safety would be obeyed. I find unpersuasive Respondent's reference to the possibility that a trailing wake from another vessel passing *Hannah* while the latter was docked, secured, and being watched for threats to her safety, establishes the work stoppage in this case as unprotected. Her lines, tow, and any fenders were secure and such a routine occurrence as a passing wake could have, if at all necessary, be handled as well then, as if such occurred before the work stoppage ... *Hannah*, then, was not left to the winds, current, and tide, and Respondent has failed to prove the existence of any potential risk of substantial property damage.

Pantex Towing Corp., 258 NLRB 837, 843. These facts were put in issue by Pantex as a substantive defense to the unfair labor practice claim, were litigated by the parties, and were actually decided. Since proof of these facts would have defeated the unfair labor practice charge regarding Colley's discharge, the finding that Pantex "failed to prove the existence of any potential risk of substantial property damage" was necessary to the decision and bars relitigation in this action. Pantex is therefore collaterally estopped from seeking to prove in this action that Glidewell or the SIU caused the abandonment of the HANNAH and thereby created an unsafe condition posing a dangerous risk to Pantex's property. To this extent only, the district court's judgment is affirmed.

## II.

The next issue is whether, in light of the administrative determination that the work stoppage was protected, Pantex has alleged tortious activities for which it may recover its business losses. Pantex seeks compensatory damages to cover the losses it sustained when the HANNAH and her tow sailed late on two occasions and light on one occasion. These business losses were the direct result of the January 11–12 work stoppage.

In *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Court reiterated that States have the right "to deal with violence and threats of violence appearing in labor disputes." *Id.* 383 U.S. at 729, 86 S.Ct. at 1140. The Court held, however, that in order to accommodate federal labor policy, the liability of unions for damages

in cases such as this must be carefully limited:

> [T]he permissible scope of state remedies in this area is strictly confined to the direct consequences of such conduct, and does not include consequences resulting from associated peaceful picketing or other union activity.

*Id.* 383 U.S. at 729, 86 S.Ct. at 1141. The Court also noted that its prior opinions:

> have approved only remedies carefully limited to the protection of the compelling state interest in the maintenance of domestic peace. Thus, in *San Diego Building Trades Council, Millmen's Union, Local 2020 v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775, we read our prior decisions as only allowing "the States to grant compensation for the consequences, as defined by the traditional law of torts, of conduct marked by violence and imminent threats to the public order," id., at 247, 79 S.Ct. at 781, and noted that in *Laburnum [United Construction Workers v. Laburnum Construction Corp.,* 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025 (1954)]

> "damages were restricted to the 'damages directly and proximately caused by wrongful conduct chargeable to the defendants ...' as defined by the traditional law of torts.... Thus there is nothing in the measure of damages to indicate that state power was exerted to compensate for anything more than the direct consequences of the violent conduct." Id. [359 U.S.], at 248, n. 6, at 249, 79 S.Ct., at 782 [n. 6].

In *Russell [International Union, United Automobile Aircraft and Agr. Implement Workers v. Russell,* 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958)], we specifically observed that the jury had been charged that to award damages it must find a proximate relation between the violence and threats of force and violence complained of, on the one hand, and the loss of wages allegedly suffered, on the other. 356 U.S., at 638, n. 3, 78 S.Ct., at 935 [n. 3].

*Gibbs,* 383 U.S. at 730, 86 S.Ct. at 1141. In *N.A.A.C.P. v. Claiborne Hardware Co.,* 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982), the Court explained the holding in *Gibbs* as follows: "The careful limitation on damage liability imposed in *Gibbs* resulted from the need to accommodate state law with federal labor policy.... While the State legitimately may impose damages for the consequences of violent conduct, it may not award compensation for the consequences of nonviolent, protected activity. Only those losses proximately caused by unlawful conduct may be recovered." *Id.* 458 U.S. at 918, 102 S.Ct. at 3428.[7]

The Ninth Circuit recently discussed these principles in *Rainbow Tours, Inc. v. Hawaii Joint Council of Teamsters,* 704 F.2d 1443 (9th Cir.1983). In that case, Rainbow, a tour bus company, brought an action alleging that the union had engaged in unlawful mass picketing and threats that tortiously interfered with Rainbow's employment contracts by causing its employees to fail to report to work. Rainbow sought to recover its resulting business losses.

Rainbow had been a non-union business and some of its employees began inquiring into joining a union. Subsequently, the union picketed the Rainbow yard. For sev-

---

**7.** A striking case in which the Court held that the traditional remedies for state law torts must be modified in order to accommodate federal labor policy was *Linn v. United Plant Guard Workers of America, Local 114,* 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966). In *Linn* an official of an employer sought damages under state law for defamatory statements published during a union organizing campaign by the union and its officers. The Court held that "[i]n order that the recognition of legitimate state interests does not interfere with effective administration of national labor policy the possibility of such consequences must be minimized," and recovery under state remedies for libel was limited to where the plaintiff can show malice and actual harm. The court also held that even where under state law certain language may be actionable as libel *per se,* thus automatically entitling the plaintiff to damages, where federal labor policy is implicated, the complainant may not recover except upon proof of actual harm. *Id.* 383 U.S. at 64–65, 86 S.Ct. at 664.

eral days there were 30–40 pickets in the yard. The picketers were somewhat threatening and unruly and temporarily blocked ingress and egress to the yard. While Rainbow's civil action was pending the NLRB issued a decision in a proceeding against Rainbow. The Board held, in part, that the object of the picketing was lawful and that Rainbow's employees had a right to respect the picket lines. In the civil action the district court held that the NLRB decision did not estop Rainbow's state law claim and awarded Rainbow damages for its loss of business for the duration of the picketing. The Court of Appeals reversed and remanded. Although the court agreed with the district court that the union had engaged in illegal mass picketing, the court held that Rainbow could recover its business losses only if the union's mass picketing or threats coerced or intimidated Rainbow's employees into not crossing the picket line. On the other hand, if Rainbow's employees observed the picket line and refused to work because of "union principle motive," rather than because of fear, Rainbow could not recover its damages resulted from the same refusal to work even if the union had engaged in illegal activities. The court stated:

> In a case such as this when the object of a union's conduct is protected but the tactics used to attain that end are not, we believe the district court should award damages only for the losses directly resulting from the unlawful activity.

*Id.* at 1448.

■ The legal issues in the case before us are very similar to those in *Rainbow*. The allegedly unlawful conduct that occurred on the early evening of January 11, the first day of the work stoppage, is Glidewell's trespass aboard the HANNAH and the trespassory picketing by two of Pantex's employees at Glidewell's behest. Although at some points in its supplemental brief Pantex appears to claim that the picketing intimidated the employees thus inducing them to stop work, the undisputed facts show otherwise. The facts, as stated in Pantex's brief and in the summary judgment evidence, show that the picketing did not even begin until all of the employees aboard the HANNAH had agreed to the work stoppage and the work stoppage was under way. Pantex has made no other allegations that Glidewell or the SIU threatened or intimidated Pantex's employees in any way in order to coerce the January 11 work stoppage. Under these circumstances, we believe that Pantex has not alleged any facts that would entitle it to recover its business losses resulting from the January 11 protected work stoppage.

■ In its supplemental brief Pantex concedes that Glidewell and the SIU had the right to organize its employees and to call a work stoppage. Pantex argues, however, that the (alleged) fact that Glidewell was trespassing aboard the HANNAH when he called the work stoppage provides a sufficient causal nexus between appellees' tortious activity and Pantex's business losses to entitle it to recover those losses notwithstanding the fact that the stoppage was protected activity and that the employees may have voluntarily joined it. We disagree. Although Pantex may recover any damages that were proximately caused by a trespass, *see Sears, Roebuck and Co. v. San Diego County District Council of Carpenters*, 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978), Pantex is not entitled to recover all losses that merely follow the trespass in time. Such a holding would violate both the spirit and the letter of *Gibbs* and would be directly contrary to the Ninth Circuit's holding in *Rainbow*. See also *Local 20, Teamsters, Chauffeurs and Helpers Union v. Morton*, 377 U.S. 252, 261–62, 84 S.Ct. 1253, 1259, 12 L.Ed.2d 280 (1964) (district court was without power to award damages proximately caused by lawful, primary activities even though the Union may have contemporaneously engaged in unlawful acts). We therefore hold that where employees voluntarily, and not as a result of unlawful coercion, enter into a protected work stoppage, the employer may not recover against the union its business losses resulting exclusively from the work stoppage merely because the union

organizer was trespassing when the work stoppage was called.

Pantex alleges that the January 12 work stoppage by the substitute crew was motivated by fear caused by Glidewell's oral threats of violence, the union's tres- passory picketing, and by Glidewell's ram- ming of the PANTEX 2003. Unlike Pan- tex's allegations regarding the January 11 stoppage, these allegations, if proven, may be sufficient to entitle it to recover its business losses resulting from the January 12 stoppage. The issues on remand should be whether appellees in fact engaged in the alleged tortious activity, and if so, whether the employees' refusal to work was moti- vated by fear or by reasons valid under the labor laws. *Rainbow,* 704 F.2d at 1447– 48.[8]

### III.

In conclusion, we hold that Pantex is collaterally estopped by the findings of the NLRB from claiming that its employees abandoned the HANNAH and the PAN- TEX 2003 on January 11 thus creating an unsafe condition posing a dangerous threat to Pantex's property. To this extent the judgment of the district court is AF- FIRMED. As to the remainder of Pantex's claims, we REVERSE the district court's grant of summary judgment and RE- MAND for further proceedings consistent with this opinion.

---

8. We express no opinion whether proof of the facts alleged by Pantex regarding Glidewell's three alleged trespasses and the alleged assault occurring on the night of January 12 would entitle Pantex to recover damages. We note, however, that these alleged tortious acts did not directly cause any of Pantex's business losses and Pantex has not alleged any actual damages resulting from these activities.