TJOFLAT, Circuit Judge,
concurring in part and dissenting in part:
“Scab” in the labor context is a pejorative term that frequently carries with it the threat of harm. See John P. Luding-ton, Annotation, Defamation: Designation as Scab, 65 A.L.R.4th 1000, 1009-10 (1988).[1] William West discovered exactly what kind of harm when he decided not to join his fellow Teamsters in striking United Parcel Service (“UPS”) during the summer of 1997. Mr. West’s daughter, Callie, was five years old at the time and suffered from epilepsy and kidney problems. She had already undergone twelve operations. Because West did not strike, the Teamsters, who controlled his medical insurance, cut off Callie’s medical coverage. See Union Casualties, Wall St. J., Sept. 2, 1997, at A18.
Rod Carter, a Miami-based UPS driver and Teamster, also discovered what it meant to be labeled a scab during the 1997 strike. While stopped at a traffic light, Carter was pulled from his delivery truck by six men, beaten, repeatedly called “nigger,” and stabbed five times with an ice pick. See Hearing on S.230: The Freedom from Union Violence Act Before the Senate Judiciary Comm., 105th Cong., at 100-01 (1997) (testimony of Rod Carter). Retaliation against scabs that summer even extended into sympathetic unions. In Houston, the president of the Police Patrolmen’s Union, Terry Martin, told his members to “go into a ‘zero tolerance’ mode, and do everything possible to get that UPS ‘scab’ truck off the road.” Stephen Johnson, Police Union Urges Members to Pull Over “Scab” UPS Drivers, Hous. Chron., Aug. 7,1997, at 1.
Lest one think the Teamsters are the only union that harms scabs, here are two other examples. During a United Auto Workers strike in Winchester, Virginia, striking workers vandalized the property *1202 of a woman they targeted as a scab, fired a gun through her car window, and left a bloody cow’s head on the hood of her car. See Hearing on S.230: The Freedom from Union Violence Act Before the Senate Judiciary Comm., 105 th Cong., at 4 (1997) (testimony of Reed Larson). Finally, in the midst of a United Mine Workers strike, striking miners shot and killed Eddie York for continuing to work even though the company he worked for was not the target of the United Mine Workers strike. See id.
As these examples illustrate, in the labor context, scab is a factual allegation with a specific definition and consequences. See Old Dominion Branch No. 496, Nat’l Ass’n of Letter Carriers, AFL-CIO v. Austin, 418 U.S. 264, 284, 94 S.Ct. 2770, 2781, 41 L.Ed.2d 745 (1974) [hereinafter Letter Carriers ] (stating that “the only factual statement in the disputed publication is the claim that appellees were scabs”). If this allegation is false and made with actual malice, like any other factual assertion, it is defamatory. Cf. id. at 283, 94 S.Ct. at 2780 (finding that “[r]ather than being a reckless or knowing falsehood, naming the appellees as scabs was literally and factually true”). Because I conclude that (1) the Air Line Pilots Association’s (“ALPA”) allegation that they were scabs was false and (2) a jury could find for either party on the issue of actual malice, I would hold that the district court erred in granting appellees summary judgment on appellants’ libel claim.[2] I, therefore, respectfully dissent.[3]
I.
The Air Line Pilots Association (“ALPA”) is a labor union that represents airline pilots from a number of commercial airlines. Within each airline, ALPA operates through a Master Executive Council (“MEC”), a board of elected pilot representatives that makes union policy decisions relating to that airline.
On March 4, 1989, the MEC at Eastern Airlines decided that Eastern’s pilots should conduct a “sympathy strike” in conjunction with a strike against Eastern by the International Association of Machinists (“IAM”).[4] Accordingly, the pilots were directed to stop working, and not to return to work until such time as an agreement was reached between IAM and Eastern. The sympathy strike lasted until November 22, 1989, when the Eastern MEC voted to end the strike (despite the fact that the IAM strike had not ended) and directed the phots to return to work.
After the conclusion of the sympathy strike, ALPA produced and distributed a publication titled “The Scabs of Eastern of the Strike of ’89,” which listed the more than two thousand pilots who allegedly refused to honor the strike and crossed the machinist union’s picket lines to fly for Eastern. The appellants in this case are pilots who were on this list. They brought suit against ALPA,[5] alleging, inter alia, that the publication of the list constituted libel. The district court disposed of the libel claim on summary judgment, concluding that the pilots had not shown that the “scab” allegation was false, as required by law.
II.
The majority, purporting to follow the Supreme Court’s reasoning in Letter Car *1203 riers, concludes that ALPA’s statement that appellants were scabs was factually true; and thus, the district court did not err in granting appellees summary judgment. The majority, however, follows the Court’s reasoning in Letter Carriers in form rather than substance. As in Letter Carriers, this case involves a union calling people who oppose it scabs. Unlike Letter Carriers, however, the pilots that crossed the picket lines were not scabs.[6] For ALPA’s statement (that appellants were scabs) to be true, two conditions had to be met: (1) appellants worked for Eastern and (2) they did so while ALPA was on strike. It is undisputed that appellants flew for Eastern. Because ALPA was never legally on strike, however, appellants did not work during a union strike. Thus, the statement that they worked during a union strike, and therefore were scabs, was false.
A.
To succeed on a defamation claim based on statements made during a labor dispute, a plaintiff must show falsity and actual malice. A statement is false if it produces a different effect on the mind of the reasonable reader than would the truth. See Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 517, 111 S.Ct. 2419, 2432-33, 115 L.Ed.2d 447 (1991). “Minor inaccuracies” do not make a statement false. Id., 111 S.Ct. at 2433. The statement in question here is that appellants were “scabs.” To determine if this statement was false, we thus look at whether a “reasonable reader”[7] would have thought that ALPA, by calling appellants scabs, meant that they were people who worked during a union strike; or only meant to engage in rhetorical hyperbole, suggesting in a general sense that appellants were bad people. I agree with the majority’s answer to this question — -ALPA meant literally that appellants were people who worked during a union strike.
I cannot, however, agree with the majority’s conclusion that ALPA’s scab allegation was true. The reasonable reader analysis dictated by Masson ends with the statement that appellants were scabs; it does not extend to determining whether ALPA was on strike. Yes, appellants can only be scabs if ALPA was on strike. But, we do not inquire whether ALPA was on strike based on the reasonable reader’s perception. Rather, we determine whether a union was on strike by looking to the rules that the union established for itself in its constitution and by-laws.[8] If these rules were not followed, the union was not *1204 on strike. The majority at various times calls this approach “highly, formalistic, legal analysis” and “technical [and] legalistic.” See ante at 1193. I agree. But the fact of the matter is that ALPA’s Constitution and By-laws set forth the requirements ALPA had to follow in order to call its sympathy strike. ALPA did not follow its own rules; therefore, ALPA was not legally on strike, and its allegation that appellants were scabs, i.e., people who worked during a union strike, was false.
1.
Article I of the ALPA Constitution and By-Laws states: “[w]hen a suspension or withdrawal of service is called for ..., the members will be balloted before such action may be taken.” The procedures for calling a strike are spelled out in more detail in Article IV, which states:
The approval by a majority vote of the Master Executive Council of an airline, with the advice of the President [of ALPA], is mandatory before a strike vote of the members of an airline may be taken. This membership strike vote shall be by secret ballot.... A simple majority of valid ballots returned shall govern.
Reading these provisions together, it appears indisputable that the ALPA Constitution and By-Laws requires a vote of the membership before a strike may be called.
ALPA, however, provides us with two alternative readings of these provisions. The first is that they are discretionary — in other words, they detail the procedures to be followed if a strike vote is taken, but do not mandate that such a vote be taken before a strike is called. While this approach may be plausible as to the Article IV provision, it is entirely incompatible with Article I, which states that “members will be balloted” (emphasis added) before a strike is called. Second, ALPA suggests, and the majority agrees, that the voting provisions in the Constitution and By-Laws apply only to primary strikes, and not to sympathy strikes. This interpretation is simply ridiculous. As an initial matter, this interpretation strains the English language; under ordinary rules of grammar, where a noun is left unqualified, it applies without qualification. For example, if a person says that “the cars in the fire lane are illegally parked,” we can safely assume that he is referring to all of the cars in the fire lane. It would be nonsense for him later to claim that he was referring only to the blue cars, and not the green ones. Nothing in the text or context of the statement suggests that “cars” applies only to cars of a certain color. Likewise, there is nothing in the text of the Constitution and By-Laws that distinguishes among types of strikes — understandably so, given that a strike has the same impact on labor and management regardless of the reason why it is called — and it is therefore unreasonable for ALPA now to claim that the strike provisions in its Constitution and By-Laws refer only to primary strikes. Furthermore, if a union were to distinguish between the two types of strikes, it would be far more logical to require a membership vote for a sympathy strike than for a primary strike: whereas workers may benefit directly from a primary strike (through a renegotiated contract), the only benefits they could gain through a sympathy strike would be indirect and speculative. Therefore, even if substantial deference is afforded ALPA’s interpretation of its own governing documents, see Dow v. United Bhd. of Carpenters and Joiners of Am., 1 F.3d 56, 58 (1st Cir.1993), a membership vote was required before a strike could commence.[9] Because *1205 no such vote was taken,[10] the strike was invalid.
2.
Appellees argue that the strike was legal even though not properly authorized because the pilots of Eastern did in fact engage in a strike in which the appellants did not participate. This argument, however, fails adequately to account for the context in which the “scab” allegation is being made. It is true that in the context of an ordinary wildcat strike (in which a group of workers decides on its own to stop work), the charge of “scab” made by a striking worker to another worker who does not join the strike may well be accurate despite the lack of official union authorization. This case, however, presents a very different situation. In this case, we must assume that ALPA intended, through the publication of the scab list, to convey that its strike was legal. A contrary assumption would mean that ALPA published a list of all the pilots who worked during a strike it illegally ordered. Although it is theoretically possible that ALPA wanted to convey such a message, it is highly unlikely, for such a message would only harm the union.
Further, the scab list was distributed to pilots at other airlines and was — by ALPA’s own admission — intended to make it difficult for the named phots to obtain employment with other airlines. If the strike was illegally called, pilots’ inclusion on the scab list would provide no basis for denying them employment. On the contrary, a pilot’s refusal to participate in an illegal strike, called by union bosses acting outside the scope of their authority, would make the pilot a more attractive candidate for employment. Inclusion on the scab list would in no way demean the character of the persons so included, but would instead be a badge of honor.
Thus, in the context of this case, the scab allegation makes sense only if the strike was legally called, because only then would inclusion on the scab list carry a negative connotation. It was therefore a necessary assumption of the persons reading the scab list that the strike was legally called. This assumption was buttressed by the fact that the scabbing charge was being made by the union, in a publication distributed by the union pursuant to a formal union resolution.[11] Under those circumstances, a reasonable reader undoubtedly would assume that the persons on the scab list had refused to participate in a valid, union-authorized strike. This assumption, however, was false. As demonstrated in the preceding section, the strike was not called in accordance with the union’s Constitution and By-laws, and was therefore invalid. Consequently, the scab allegation was false, and the appel *1206 lants have established the falsity element of their libel claim.
B.
In addition to showing that the scab allegation was false, the appellants, to succeed on their libel claim, also must show that the allegation was made with actual malice — in other words, that the allegation was made knowing that it was false, or with reckless disregard as to its accuracy. See New York Times Co. v. Sullivan, 376 U.S. 254, 279-80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964); Letter Carriers, 418 U.S. at 281-82, 94 S.Ct. at 2779-80 (extending the New York Times framework to statements made during labor disputes). “Reckless disregard,” in this context, means that the defendant made the allegation despite “entertaining] serious doubts as to the truth” thereof. St. Amant v. Thompson, 390 U.S. 727, 730-31, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). In this case, there are two different theories — one argued by all appellants and one only argued by the Group I appellants — concerning how ALPA acted with actual malice. Each theory is discussed in this section.
1.
The appellants’ first theory is that ALPA acted with malice because it knew that the strike was illegally called, or at least had substantial doubts regarding the legality of the strike, when it published the scab list. ALPA, in response, maintains that it genuinely and without a doubt believed that no membership vote was needed for a sympathy strike, and thus believed that the individuals on the scab list were in fact scabs.[12] In support of its position, ALPA points to its long-standing administrative policy of not taking a membership vote prior to calling a sympathy strike, and to the testimony of ALPA offi-ciáis that they believed the strike was properly authorized.[13]
The appellants, meanwhile, contend that under the circumstances it is highly improbable that ALPA actually believed — at least without serious doubts — that it had the power to call a strike without taking a vote of the membership. See generally Hunt v. Marchetti, 824 F.2d 916, 919 (11th Cir.1987) (noting that malice may be inferred from circumstantial and indirect evidence). Four arguments support their contention.
First, the appellants point out that the requirement of a membership vote is patently evident from ALPA’s own Constitution and By-Laws. Assuming, therefore, that the ALPA leadership read its own Constitution, it must have known that a vote was required. This seems a fair assumption considering the substantial legal significance given to voting rights contained in a union’s Constitution and Bylaws. Federal law provides a cause of action against a union for denying a member the right to vote, if the right to vote is contained in the union’s Constitution and By-laws. See 29 U.S.C. § 411(a)(1) (1994); Christopher v. Safeway Stores, Inc., 644 F.2d 467, 470 (5th Cir. Unit A May 1981). ALPA is no stranger to this cause of action; it has been sued on the basis of federal voting rights requirements on numerous occasions, both before and after the events giving rise to this lawsuit. See, e.g., Michelotti v. Air Line Pilots Ass’n, 61 F.3d 13, 14 (7th Cir.1995); O’Neill v. Air Line Pilots Ass’n, Int’l, 886 F.2d 1438, 1447-48 (5th Cir.1989), rev’d on other grounds, 499 U.S. 65, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991); Klemens v. Air Line Pilots Ass’n, Int’l, 736 F.2d 491, 495 (9th Cir.1984). Further, state law generally provides for a breach of contract action *1207 when a union violates the terms of its Constitution and By-laws. See International Ass’n of Machinists v. Gonzales, 356 U.S. 617, 618-19, 78 S.Ct. 923, 924, 2 L.Ed.2d 1018 (1958). Finally, and more generally, federal law imposes a “duty of fair representation” on unions that requires them always to act in their members’ best interests, see Air Line Pilots Ass’n, Int’l v. O’Neill, 499 U.S. 65, 74-76, 111 S.Ct. 1127, 1133-34, 113 L.Ed.2d 51 (1991); such a duty suggests that unions are expected to be aware of their constitutional obligations to their members. These obligations include, I submit, the duty not to defame as “scabs” members who refused to participate in an illegal strike. In light of this body of law — and ALPA’s known familiarity with it — it would be difficult for ALPA to claim that it was unfamiliar with the voting requirements contained in its own Constitution and By-Laws, or that it honestly thought it could ignore the requirements of the Constitution and By-Laws on the basis of its internal administrative policies.
Second, the idea that the union leadership would not be required to poll the membership before calling a strike is so implausible that it seems unlikely that ALPA actually believed it. See Hunt v. Liberty Lobby, 720 F.2d 631, 643-46 (11th Cir.1983) (stating that implausibility may be evidence of actual malice). It is hard to imagine an organizing campaign in which the union leaders say to the workers, “come join our union, and we’ll decide whether you should work or strike, without asking you.” Such an approach would deprive workers of any direct input into the most important decision that a union makes. Furthermore, such a system would contain an enormous potential for corruption: management could avert a strike simply by bribing a few individuals, without having to respond to the demands of the union membership as a whole. (Conversely, those same individuals could threaten a strike — regardless of the sentiment of the membership as a whole — in order to obtain a bribe from management.) [14]
Third, an opinion poll taken by ALPA two weeks prior to calling the strike suggests that ALPA had serious doubts regarding its power to call a strike unilaterally. The poll consisted of questionnaires sent to all Eastern ALPA members asking them to choose among the following options: (1) “I would honor an IAM picket line at EAL”; (2) “I would not honor an IAM picket line at EAL”; or (3) “My elected MEC representatives are best qualified to make this decision, if and when an IAM strike occurs, and I will abide by their decision.” The inclusion of the third option is telling: if ALPA officials were confident of their constitutional power to call a strike without taking a membership vote, they would, at most, ask ALPA members to choose between the first two options in order to gauge the feelings of the membership prior to making their decision. The availability of the third option could lead a reasonable jury to conclude that ALPA knew (or at least suspected) that it could not call a strike on its own, and that the purpose of the poll was to encourage the members to abdicate their voting rights.
Finally, ALPA’s lack of investigation may suggest actual malice. When there is no pressing need for Immediate publication of a defamatory allegation, actual malice may be inferred if the investigation given to the allegation is grossly inadequate under the circumstances. See Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 692-93, 109 S.Ct. 2678, 2698-99, 105 L.Ed.2d 562 (1989); Vandenburg v. Newsweek, Inc., 441 F.2d 378, 380 (5th Cir.1971).[15] In this case, the allegation is *1208 very serious — ALPA officials believed (and hoped) that by labeling the appellants “scabs,” they would permanently prevent them from obtaining employment with a commercial airline. See infra note 25. Under those circumstances, and given the union’s duty of fair representation, the union must conduct a substantial investigation before it decides whether to distribute a scab list. Although ALPA thoroughly researched whether the listed individuals actually crossed the IAM picket lines, there is no evidence that it investigated the more foundational question of whether its Constitution and By-laws required a membership vote prior to calling a sympathy strike. For instance, there is no evidence that ALPA consulted counsel for a legal opinion regarding its authority to call a sympathy strike without a vote of the membership.[16] In the absence of such evidence, a jury reasonably could infer that ALPA made the scab allegation with serious doubts as to its accuracy.
In sum, under this theory, a reasonable jury could find for either side on the issue of malice. The district court therefore erred in granting summary judgment and substituting its judgment for that of a jury-
2.
Even if the scab allegation was not made with malice as to all of the pilots (because ALPA actually and non-recklessly believed that the strike had been called in accordance with the ALPA Constitution and By-Laws), it may nevertheless have been made with malice as to a subset of the pilots. On August 6, 198& — five months after the beginning of the strike — the Eastern MEC called a meeting of all Eastern ALPA members to discuss the union’s course of action.[17] At the meeting, the chairman of the Eastern MEC, Captain Jack Bavis, said that the striking pilots should return to work. Within the next few days, several of the appellants — known as the “Group I” pilots — returned to work for Eastern.[18] Union officials other than Bavis subsequently announced that the strike was still ongoing, and ALPA did not formally conclude the strike until November 22. The Group I pilots were therefore included on the scab list.
This sequence of events raises the possibility that the strike was officially concluded on August 6, 1989. If so, and if ALPA knew this when publishing the scab list, then ALPA acted with actual malice as to the Group I pilots — even if it believed that the strike had been legitimately called in the first instance. In this section, therefore, I discuss (a) whether the strike was in fact terminated on August 6, and, if so, (b) whether ALPA knew this to be the case (or acted with reckless disregard of the truth) when it accused the Group I pilots of being scabs.
*1209 a.
ALPA argues that the strike could not have been concluded by Bavis’ August 6 remarks because Bavis did not have the authority to end the strike unilaterally; that decision had to be made by the president of ALPA and a vote of the entire MEC. ALPA may well be correct in this assertion;[19] however, Bavis’ lack of actual authority to end the strike is irrelevant in light of his apparent authority to do so. See North River Energy Corp. v. United Mine Workers of Am., 664 F.2d 1184, 1192 (11th Cir.1981) (noting that acts of a union agent on behalf of the union committed within the scope of the agent’s apparent authority “bind the union, regardless of whether they were specifically authorized or ratified”). Apparent authority is “the authority a principal knowingly tolerates or allows an agent to assume, or which the principal by his actions or words holds the agent out as possessing.” Owen Indus., Inc. v. Taylor, 354 So.2d 1259, 1261 (Fla. 2d DCA 1978). Bavis, as chairman of the Eastern MEC, undisputedly was an agent of ALPA. ALPA held Bavis out as possessing the authority to terminate the strike by placing the following sentence on the front page of the ALPA Pilots’ Strike Manual: “PLEASE KEEP IN MIND: A STRIKE ACTION WILL NOT BE CALLED OFF OR TERMINATED EXCEPT BY DIRECTION OF THE MEC CHAIRMAN.” Consequently, Bavis had the apparent authority to end the strike.
Given that Bavis had the apparent authority to end the strike, the next question is whether he exercised that authority. Bavis’ exact words are unknown,[20] but the parties agree that he said that the striking pilots should return to work. ALPA maintains that Bavis was expressing his individual views in the context of a debate regarding the future of the strike. In support of its position, ALPA points to the fact that the meeting culminated in a vote in which the majority of the pilots voted to continue striking. ALPA also points to other statements made by Bavis during the meeting, such as his statement that he was “speaking just as Jack Bavis, the pilot” and his statement that “I’m not going to go back to work personally unless we all go back to work,” as well as his affidavit that he never told the pilots to cross picket lines prior to November 22. Finally, ALPA points to certain communiqués issued subsequent to August 6 — such as an August 11 letter to all Eastern pilots— in which it maintained that the strike was still ongoing.
The appellants, on the other hand, maintain that Bavis was announcing that the strike was over. In support of their position, they point to seventeen affidavits in which various Group I pilots state that ALPA terminated the strike on August 6, basing their conclusion on Bavis’ statements. They also point to disciplinary charges brought against Bavis by ALPA that “Capt. Bavis did, on August 6, 1989, publicly advise the Eastern pilots to abandon their picket activities and to return to work at Eastern, accomplishing this traitorous act during a ... meeting to which the striking Eastern pilots were listening via a system-wide audio transmission” — charges that are highly inconsistent with ALPA’s present position that Bavis was merely exercising his First Amendment right to express his personal opinion in an open debate. In addition, they point to a statement in ALPA’s official newsletter that “[i]n August 1989, ALPA National advised the Eastern pilots to go back to work.”[21] *1210 Finally, the surrounding circumstances support the appellants’ argument: given Bavis’ apparent authority to end the strike, the desire of many pilots to return to work, and the severe consequences to the pilots of returning to work in violation of the strike, see supra note 11, other ALPA leaders at the meeting seemingly would have taken steps to clarify Bavis’ remarks if they did not want them to be interpreted as authorization to return to work.
In sum, there is a genuine issue of material fact as to whether ALPA terminated the Eastern pilots’ strike on August 6, 1989. If this issue is resolved against ALPA, then the Group I pilots are entitled to a jury determination on whether the scab allegation was made with actual malice, as I discuss in the next subsection.[22]
b.
ALPA acted maliciously in regard to the Group I pilots if it published the scab list knowing that (or with reckless disregard as to whether) Jack Bavis terminated the strike on August 6. In this regard, ALPA has presented testimony and post-August 6 eommuniqués from its own officials stating that it genuinely and non-recklessly believed Bavis did not terminate the strike and that the strike was continuing.[23] On the other hand, the appellants have presented substantial circumstantial evidence of actual malice — namely, that other ALPA officials heard Bavis’ statements, and therefore knew that the strike had been terminated when they published the scab list. In addition, the charges brought against Bavis by ALPA are compelling evidence that ALPA knew that he had terminated the strike. Also, because ALPA knew that many of the pilots returned to work in response to Bavis’ statements, ALPA’s failure to consider the practical effect of those statements prior to calling the pilots “scabs” may have constituted reckless disregard of the truth under the circumstances. In other words, if ALPA induced the Group I pilots to return to work, a jury could reasonably infer that ALPA at least had serious doubts when it then turned around and called those pilots “scabs.” Finally, ALPA’s lack of investigation into the effect of Bavis’ statements suggest mahce, as discussed in part II.B.l, supra.
A genuine issue of material fact exists regarding mahce as to the Group I pilots. This is an additional reason (along with the theory of mahce discussed in part II.B.l, supra) why summary judgment was inappropriate.
C.
Finally, the appellants must estabhsh that injury resulted from ALPA’s publication of the scab hst. Florida law recog *1211 nizes certain types of libels as “libel per se,” meaning that injury is presumed and the plaintiff need not present evidence on the issue. See Briggs v. Brown, 55 Fla. 417, 46 So. 325, 330 (1908). Under federal law, however, a libel action arising out of a labor dispute requires proof of injury, regardless of state libel law. See Linn v. United Plant Guard Workers of Am., Local 114, 383 U.S. 53, 64-65, 86 S.Ct. 657, 664, 15 L.Ed.2d 582 (1966); Pantex Towing Corp. v. Glidewell, 763 F.2d 1241, 1248 n. 7 (11th Cir.1985).[24]
The district court, in its order granting appellees’ motion for summary judgment, expressly declined to reach the issue of injury. The court focused primarily on the truth of the scab allegation — and understandably so, since in a case of this magnitude, it is easier to decide the case on grounds (such as truth and malice) that apply to broad groups of plaintiffs, rather than on a ground (such as injury) that may involve an individualized inquiry into the circumstances of each plaintiff.[25] Nevertheless, such an inquiry may be required in light of my earlier conclusions that the scab allegation is false and that there is a genuine issue of material fact as to actual malice. This case, therefore, should properly be remanded for further proceedings on this issue. I take no position on whether there is a genuine issue of material fact regarding injury.
III.
In conclusion, the appellants have established, as a matter of law, that the 1989 Eastern Airlines strike was illegally called and therefore ALPA’s scab allegation was false. They have presented sufficient evidence to create a jury issue as to whether the allegation was made with actual malice because ALPA knew (or acted with reckless disregard as to whether) the strike was illegal. Even if the jury answered that question in the negative — in other words, if a jury found for ALPA on the issue of malice — the Group I pilots would nevertheless have a claim for libel. A jury could find that (1) Captain Jack Bavis terminated the strike on August 6, 1989, and (2) ALPA published the scab list knowing this, or with reckless disregard as to whether the strike was so terminated. I take no position on the third element of the appellants’ claim, injury.
For the foregoing reasons, I respectfully dissent.

. The Oxford English Dictionary (the “OED”) contains a compilation of the uses of the word scab in a labor context. The first known use occurred in 1777, "[t]he Conflict would not been [sic] so sharp had not there been so many dirty Scabs; no Doubt but timely Notice will be taken of them.” Oxford English Dictionary 550 (1989). Other uses of the term scab the OED cites: ”[t]he offending member was then termed a scab and wherever he was employed no others of the society were allowed to work;” “[t]he man who takes the place of another when that other engages in a struggle with a corporation is a 'scab';” "[t]he scabs soon found out what it was like to be hated;” "Having thus given the characteristics and conditions of the 'legal,' or hon-ourable trade, I next turn my inquiry to the state of the labouring men, women, and chil- ■ dren employed by the shop-masters, who are distinguished from the 'wages’ (or legal) shops by the terms ‘illegal,’ 'scab,' or 'slaught-ershop ’ keepers; ” "If there is a strike ordered I will be damned if I am going to scab;” and "I won’t scab any man’s job.” See id. (citations omitted).
Probably the most famous use of the term scab is from a poem generally attributed to Jack London entitled "Ode to a Scab,” which appeared on the cover of the Air Line Pilots Association ("ALPA”) publication:
After God had finished the rattlesnake, the toad, and the vampire, He had some awful substance left with which he made a SCAB. A SCAB is a two-legged animal with a corkscrew soul, a water-logged brain, and a combination backbone made of jelly and glue. Where others have hearts, he carries a tumor of rotten principles.
When a SCAB comes down the street, men turn their backs and angels weep in heaven, and the devil shuts the gates of hell to keep him out. No man has a right to SCAB as long as there is a pool of water deep enough to drown his body in, or a rope long enough to hang his carcass with. Judas Iscariot was a gentleman compared with a SCAB. For betraying his Master, he had character enough to hang himself. A SCAB HASN’T!
Esau sold his birthright for a mess of pottage. Judas Iscariot sold his Savior for thirty pieces of silver. Benedict Arnold sold his country for a promise of a commission in the British Army. The modern strike-breaker sells his birthright, his country, his wife, his children, and his fellowmen for an unfulfilled promise from his employer, trust or corporation.

. I agree with the majority, however, that the libel claim of appellant Joseph S. Norman, II is insufficient as a matter of law. Hence, in referring to appellants I exclude Norman.

. I concur in the majority’s affirmance of the district court's dismissal of appellants’ claim, under Fed.R.Civ.P. 12(b)(6), that ALPA tor-tiously interfered with appellants’ business relationships with other airlines.

. A "sympathy strike” occurs when members of a union stop working to show support for another union that has a grievance with management. See NLRB v. Peter Cailler Kohler Swiss Chocolates Co., Inc., 130 F.2d 503, 505-06 (2d Cir.1942).

. The appellants also sued certain individual executives in ALPA and in the Eastern MEC. I refer to all of the defendants/appellees as "ALPA.”

.According to Webster's, a "scab" is "(1): one who refuses to join a union (2): a member of a union who refuses to strike or returns to work before a strike has ended (3): a worker who accepts employment or replaces a union worker during a strike (4): one who works for lower wages than or under conditions contrary to those prescribed by a union." See Webster’s Third New International Dictionary 2022 (1993); see also ante at 1193 n. 7.
The Court in Letter Carriers found the scab designation true because the appellants refused to join the National Association of Letter Carriers, and refusing to join a union is one definition of scab. See Letter Carriers, 418 U.S. at 283, 94 S.Ct. at 2780. In this case, the only possible definition of scab ALPA could have intended to apply to appellants was that they worked during a union strike. As discussed below, appellants did not violate a legal union strike; therefore, the allegation that they were scabs is false.

. Reasonable reader is a standard in defamation cases, such as a reasonable person is a standard in negligence cases. I do not, therefore, quote the term in the remainder of this opinion.

. The majority today turns labor law on its head by finding that courts, when determining if a strike occurred, are not to look at whether a union followed the rules and procedures contained in its constitution and bylaws. Rather, courts are to look at whether a reasonable reader would perceive that the union was on strike. In other words, union leaders can call strikes on their own initiative regardless of their constitution's requirement of majority vote, and the strike will be "true" as long as people perceive it as such. Disregarding the fact that such an oligarchical practice contradicts the primary purpose of unions — democratizing the workplace — the majority, with a straight face, declares that courts are not to consider the "strictly legalis *1204 tic or literal interpretation” of the word strike. See ante at 1193. Why a United States Court of Appeals should not be legalistic is unclear to me. Should a forest have no trees?

. The majority points out that, for over thirty years, ALPA has interpreted its Constitution and By-Laws as not requiring a membership vote for a sympathy strike. This tells us merely that ALPA’s interpretation has been consistent, not that it is reasonable. Equally irrelevant to the question of the legality of the strike is the fact that ALPA’s interpretation is included in ALPA’s Administrative Manual; the ALPA Board of Directors (the author of *1205 the manual) has the power to interpret and apply the ALPA Constitution, but not to ignore it. Otherwise, the Constitution and By-Laws would be no more than default provisions, subject to revision at the whim of the Board of Directors.

. ALPA members were polled two weeks pri- or to the strike declaration to see whether they would honor an IAM picket line. This was clearly an attempt by ALPA to gauge the feelings of its members; it was not — as ALPA properly concedes — the equivalent of a membership vote on whether ALPA should strike. The significance of this poll is discussed at greater length in part II.B.l, infra.

. On March 29, 1989 — about four weeks after the beginning of the strike — the Eastern MEC unanimously resolved "to publish a finalized list of strike-breaking pilots at the conclusion of the ALPA sympathy strike” and "to bring Article VIII charges against all strike-breakers in accordance with [the] ALPA Constitution and By-Laws.” Article VIII of the ALPA Constitution and By-Laws outlines the procedures for disciplinary actions by the union against its members and the grounds on which such actions may be brought. Under Article VIII, any member may be disciplined, fined, or expelled for working during an ALPA strike. ALPA's Administrative Manual further explains that any ALPA member who "participates in strikebreaking by actually flying the airplanes of an airline on a legal ALPA-sanctioned strike shall be automatically expelled from membership in ALPA.” ALPA Administrative Manual § 65-12, at 271 (1993) (emphasis added).

. When I speak of what ALPA "believed,” I am referring to the beliefs of the ALPA officials responsible for the publication of the scab list. See New York Times Co., 376 U.S. at 287, 84 S.Ct. at 730.

. The majority apparently finds this evidence to be credible, and therefore concludes that ALPA did not act with malice. There is, however, substantial evidence (discussed later in this subsection) that ALPA, despite its assertions to the contrary, knew that the strike was invalidly called. The weighing of conflicting evidence is a matter within the province of the jury, not this court.

. The idea of concentrating so much power in the hands of a few individuals recalls Lord Acton’s oft quoted phrase, ''[p]ower tends to corrupt and absolute power corrupts absolutely.” John Bartlett, Familiar Quotations 615 (15th ed.1980).

. In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

.Had ALPA so inquired, its attorney may well have concluded that any reading of the agreement that allowed union officials to call a strike without a membership vote would be void as against public policy, because such an interpretation would create an environment in which corruption would be likely to occur. Indeed, it was in response to such concerns that Congress passed the Labor-Management Reporting and Disclosure Act ("LMRDA”), 29 U.S.C. §§ 401-531 (1994) — which, as discussed above, protects the rights of union members to vote on union business when such a right is contained in the union’s Constitution and By-laws. The LMRDA reflects a federal policy favoring democratic conduct of union activity, out of a recognition that the tremendous power given to labor unions under federal law must be accompanied by democratic safeguards to prevent corruption. See NLRB v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 180-81, 87 S.Ct. 2001, 2006-07, 18 L.Ed.2d 1123 (1967). In the words of Archibald Cox, a key participant in the drafting of the LMRDA, "[a]n individual worker gains no human rights by substituting an autocratic union officialdom for the tyranny of the boss.” Archibald Cox, The Role of Law in Preserving Union Democracy, 72 Harv. L.Rev. 609, 610 (1959).

. The meeting was held in Miami and was broadcast to all other Eastern pilot bases.

. The remainder of the appellants either never joined the strike or ceased striking prior to August 6.

. Although the ALPA Constitution and ByLaws is clear regarding how a strike is to be initiated, see supra part II.A.l, they appear to be silent on the topic of how a strike is to be concluded.

. No official recording of the pilots' meeting was made. Various pilots made unofficial recordings (some of which are in the record), but these recordings are incomplete or unintelligible in key places.

.Contrary to the majority's suggestion, see ante at 1199 n. 19, the newsletter and the charges proffered by ALPA are highly probative circumstantial evidence as to what was said on August 6. By way of analogy, if the buyer of widgets gives the seller a check for $5000 following a meeting with the seller, the check is. highly probative as to the what the parties said at the meeting regarding the purchase price. (I note that ALPA also submitted *1210 after-the-fact evidence to the district court— namely, the communiques discussed earlier— to support its position regarding what Bavis told the pilots on August 6.)

. Even'if ALPA did not in fact terminate the strike on August 6, there may be another theory on which the Group I pilots can establish malice. In order for a worker to be a scab, he must know that his union is on strike. A worker who works in violation of a strike of which he is unaware is no more a "scab” than a military officer who unwittingly divulges security information is a "traitor”— both may be fools, but neither can be said to have engaged in an act of intentional betrayal. And, as the language quoted in note 1, supra, suggests, an allegation of scabbing necessarily implies betrayal or disloyalty. Thus, if the Group I pilots genuinely believed that their union was no longer on strike, then they could not accurately be described as scabs. Consequently, if ALPA knew that the Group I pilots believed that the strike ended on August 6, then it acted with malice. Because this theory of actual malice was not presented to the district court or to this court on appeal, however, I discuss it no further.

. The majority, as with the discussion of malice as to all of the pilots, see supra part II.B.l, finds ALPA's evidence to be credible and therefore concludes that ALPA did not act with malice. Again, however, in light of the contrary evidence discussed in the remainder of this paragraph, the weighing of the evidence is a matter for the jury, not the court. See supra note 13.

. "Injury,” however, may be defined broadly to include injury to reputation, mental suffering, and so forth. See Linn, 383 U.S. at 65, 86 S.Ct. at 664.

. Of course, certain evidence of injury is probative as to all appellants — for instance, an affidavit submitted by an economist which states that, out of the 2241 scab list pilots, only three found subsequent employment with a major commercial airline, whereas out of the 1146 non-listed pilots, 136 were able to find such employment. In addition, the appellants' allegations of injury are supported by the fact that the whole purpose of publishing a scab list is to cause injury. The possibility of being labeled a "scab” can encourage workers to participate in a strike only if the label harms the workers in some way. Cf. supra note 11 (noting that ALPA resolved to publish a list of strike-breaking pilots at the conclusion of the strike, presumably as a means of preventing defections). This is further confirmed in the present case by correspondence between ALPA and union members who were working during the strike, which includes claims like, "[a] scab who doesn’t change his mind in time finds it very difficult to find a job with other carriers. It's not just other pilots who don't want to work with scabs. Even managements [sic] recognize that someone who doesn’t understand loyalty does not make a reliable employee”; and ”[i]f you crossed [the IAM picket lines] for a job, the job isn’t going to last, and the next one could be hard to find.”