[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 255 
Lloyd Noland Foundation, Inc. ("the Foundation"), appeals from a judgment entered in favor of the City of Fairfield Healthcare Authority ("Fairfield"). We reverse the judgment and remand the case with instructions.
 I. Factual and Procedural Background
This case arises out of the Foundation's applications to the State of Alabama Health Planning and Development Agency ("SHPDA") for two certificates of need ("CONs"), see Ala. Code 1975, § 22-21-265, and Ala. Admin. Code r. 410-1-2-.19, to reclassify 100 existing "acute-care" hospital beds to "long-term acute care."[1] The Foundation began the application process in 1995. At that time, the Foundation owned and operated the Lloyd Noland Hospital in Fairfield ("the Hospital").
 A. The CON Application
On December 4, 1995, the Foundation filed an application for a CON, seeking to "reclassify" the 100 beds, and to "relocate 25 of the reclassified beds" to the facilities at Medical Center East, Inc. (C. at 40.) Through this procedure, the Foundation sought to operate at each location a "Medicare-certified, long-term-care `hospital-within-a-hospital.'" On March 12, 1996, SHPDA denied the application.
The Foundation requested a hearing before an administrative law judge, who, on August 9, 1996, reversed SHPDA's order. The administrative law judge held that the SHPDA Board had "acted in an arbitrary and capricious manner without reasonable justification and without fixed standards in denying the Application." (C. at 52.) The administrative law judge remanded the matter for further proceedings. On September 10, 1996, SHPDA again denied the application. Subsequently, the Foundation appealed to the Jefferson Circuit Court, Bessemer Division.
 B. The First Hospital Sale — "Amendment Two"
While the application process was pending, the Foundation sold the Hospital to Tenet HealthSystem Medical, Inc. ("Tenet"), through the execution of a "Stock Purchase Agreement" ("SPA"), dated July 15, 1996. Article XV of the SPA stated, in pertinent part: "[T]he terms of this Article XV shall continue to be fully effective and enforceable following the Closing Date for a period of fifteen (15) years."
Article XV was amended on October 4, 1996, by the execution of "Amendment Number Two to Stock Purchase Agreement." Amendment two added ¶ 15.4, which provided, in pertinent part:
 "15.4. Hospital Beds. One hundred and twenty (120) of the acute care hospital beds of the licensed `bed capacity' (as defined in Alabama Administrative Code Section 420-5-7-.01(c) (Supp. 3/31/96)) being conveyed to [Tenet] hereunder and the corresponding right to provide hospital services associated therewith (the `[Foundation] Beds') are conveyed to [Tenet] subject to the right of [the Foundation] to repurchase said [Foundation] Beds for a purchase price of $1.00, which option is hereby granted to [the Foundation], but which may be exercised by [the Foundation] as to any [Foundation] Beds only at such time as [the Foundation] is legally able to operate said [Foundation] Beds to provide long term acute care services. During such time as [the Foundation] Beds are owned by [Tenet], [Tenet] will continue to maintain the rights and benefits *Page 257 
 pertaining to said [Foundation] Beds and may use them in its hospital operations at the Hospital. Any [Foundation] Beds with respect to which [the Foundation] has not yet exercised its option are herein referred to as the `Option Beds.' In addition, [Tenet] . . . will cooperate with [the Foundation] in having the Option Beds relicensed, recertified or relocated for long term acute care purposes at the Hospital or at other sites. Said cooperation will include joining with [the Foundation] in any regulatory applications and participating in any regulatory or other proceedings (all at [the Foundation's] sole cost and expense) that are deemed necessary by [the Foundation] to obtain said relicensing, recertification and relocation."
(Emphasis added.)
That same day, the Foundation and Tenet also executed a "Lease Agreement," whereby Tenet agreed to lease to the Foundation "the Premises," defined as 19,972 square feet of space, located primarily on the second floor of the Hospital, for the purpose of "operat[ing] a long term care hospital in accordance with federal regulations C.F.R. § 412.23(e) that focuses on the treatment of patients requiring long term acute care services." The Lease Agreement also provided that the Foundation should "have an ongoing and continuing option to expand the Premises to include all or any portion of the remainder of the second floor of the [Hospital]," and that "[r]ent for such additional space . . . [would] be adjusted at the same rate per square foot as rent for the original premises." Lease Agreement, ¶ 1.2. Rent for the "original premises" was set at $25 per square foot, "per annum, payable in twelve equal monthly installments." Lease Agreement, Article III. It was agreed that the "rate per square foot [should] increase at a rate equal to the lesser of (i) the percentage increase of the Consumer Price Index (`CPI'), if any increase . . . occurred, over the CPI for the previous lease year; or (ii) five percent (5%), on each anniversary of the Commencement Date." Id.
Moreover, the Lease Agreement provided:
 "2.1 Initial Term. [Tenet] agrees to deliver possession of the Premises to [the Foundation] no later than thirty (30) days following the receipt of notice from [the Foundation] that it has received a Certificate of Need to operate the [long-term-care services] at the Premises (the `Notice Date'). The date upon which [Tenet] delivers possession of the Premises to [the Foundation] shall be referred to herein as the `Commencement Date.' The term of this lease shall, unless sooner terminated as herein provided, continue for five years following the Commencement Date. [The Foundation] shall not be obligated to take possession of the Premises until after the Notice Date. [Tenet] may use the Premises for it[s] own purposes prior to the Notice Date so long as [it] keeps the Premises in good order and repair and permits no alteration of, nor waste, damage, or injury to, the Premises.
". . . .
 "2.3 Effect of Delay or Non-Occurrence of Notice Date. In the event the Notice Date shall not have occurred on or before March 31, 1998, neither party shall be bound by the location of the Premises or the amount of rent established by the terms of this lease, and the location of the Premises and the amount of rent shall accordingly be subject to renegotiation at the option of either party. In the event the Notice Date shall not have occurred on or before March 31, 2001, this lease shall be null and void and of no further force and effect." *Page 258 
On April 7, 1998, the Jefferson Circuit Court dismissed the Foundation's appeal from the SHPDA Board's denial of its CON application on the ground that the Foundation no longer owned the beds. The Foundation appealed the dismissal to the Court of Civil Appeals. Subsequently, the Foundation and SHPDA reached a settlement, whereby the Foundation agreed to dismiss its appeal in exchange for SHPDA's permission to refile the CON application.
 C. The CON Reapplications
The reapplication process began on August 13, 1998, when the Foundation filed two letters of intent, expressing its intention to resubmit the CON applications. On September 15, 1998, the Foundation filed two CON applications. One application sought to convert 55 of the "Option Beds" to long-term, acute-care beds, and to operate them at the Hospital as a "hospital-within-a-hospital." The second application sought to reclassify 45 of the "Option Beds" as long-term, acute-care beds, and to relocate them from the Hospital to the facilities at Medical Center East, pursuant to a lease for space at that facility.[2]
On November 20, 1998, Birmingham Baptist Medical Center-Montclair ("Baptist") intervened in the Foundation's application process. On December 3, 1998, Baptist requested that the Foundation's application process be accorded the status of a "contested case," as that term is defined and discussed in Ala. Code 1975, §§ 41-22-3(3) and 41-22-12; Ala. Code 1975, § 22-21-275(6); and Ala. Admin. Code r. 410-1-8-.01
to -.02.
On December 7, 1998, Select Specialty Hospitals, Inc. ("Select"), submitted a CON application to SHPDA. Through that application, Select sought to lease and to operate 38 long-term-care hospital beds located at Baptist's facilities. At the time of the application, Baptist owned and operated those beds. In connection with Select's application, Baptist sent a letter to SHPDA, stating that it "express[ed] its support" for Select's application. The letter further stated: "Upon approval of Select's application, and subject to approval by the Board of Trustees of Baptist Health System, Inc., Baptist Montclair is prepared to enter into a lease with Select . . . and to contract with Select for necessary ancillary and support services." In January 1999, the Foundation and Medical Center East intervened in Select's application process and requested contested-case status.
In October 1999, the contested cases of both the Foundation and Select were assigned to the same administrative law judge. Subsequently, all parties resolved their differences in the cases, and, on December 2, 1999, submitted to the administrative law judge a "Joint Motion for Entry of Recommended Order" approving the issuance of the CONs to the Foundation and to Select. On January 21, 2000, without conducting a public hearing, the administrative law judge accepted and entered the "recommended order." On February 10, 2000, Baptist, Select, the Foundation, and Medical Center East joined in a letter to SHPDA, stating, in pertinent part:
 "The Alabama Administrative Procedure Act provides that `[t]he proposed order shall become the final decision of the agency without further proceedings, unless there are exceptions filed or an *Page 259 
 appeal to the agency within the time provided by rule.' Section 41-22-15, Ala. Code (1975, as amended). None of the parties to these . . . projects has filed exceptions with SHPDA. Moreover, to the extent that any party might still have the right to file exceptions, the parties hereby expressly waive such right. Accordingly, it is the position of the parties that the Recommended Order entered by the administrative law judge is due to become the final decision of SHPDA without any further proceedings."
 D. The Second Hospital Sale — the "ASA"
Meanwhile, during the Foundation's reapplication process, Tenet sold the Hospital and its assets to Fairfield. The sale was accomplished through the execution of an "Asset Sale Agreement," effective October 21, 1999 ("the ASA"). The ASA provided, in pertinent part:
 "1.7 Transfer of [Tenet] Assets. On the Closing Date, [Tenet] shall assign, transfer, convey and deliver to Fairfield, and Fairfield shall acquire all of [Tenet's] right, title and interest in and to only the following assets and properties, . . . as such assets shall exist on the Closing Date with respect to the operation of the Hospital . . .:
". . . .
 "(e) all of [Tenet's] interest (as lessor or lessee), to the extent assignable or transferable, in and to all real property leases and personal property leases with respect to the operation of the Hospital (the `Leases'), including, without limitation, those leases described in Schedule 1.7(e);
 "(f) all of [Tenet's] interest in and to all contracts and agreements . . . with respect to the operation of the Hospital (the `Contracts') including, without limitation, those Contracts described in Schedule 1.7(f);
". . . .
 "1.9 Assumed Obligations. On the Closing Date, [Tenet] shall assign and Fairfield shall assume and agree to discharge after the Closing, the following liabilities and obligations of [Tenet] and only the following liabilities and obligations (collectively, the `Assumed Obligations'):
 "(a) the Contracts, but only to the extent of the obligations arising thereunder with respect to events or periods after the Closing Date . . .;
 "(b) the Leases, including the capital lease obligations of [Tenet] with respect to the Hospital listed on Schedule 1.9(c), but only to the extent of the obligations arising thereunder with respect to events or periods after the Closing Date. . . .
". . . ."
"Lloyd Noland Hospital and Health System
"Schedule 1.7(f)
"Contracts
"See attached chart(s).
 "[Tenet's] obligations pursuant to its covenant set forth in Amendment Number Two dated October 4, 1996 to that certain Stock Purchase Agreement between Tenet HealthSystem Medical, Inc. and the Lloyd Noland Foundation, Inc. dated July 12, 1996, which provides as follows . . .:
 "Hospital Beds. One hundred twenty (120) of the acute care hospital beds of the licensed `bed capacity' (as defined in Alabama Administrative Code Section 450-5-7-.01(2)(c) (Supp. 3/3/96)) being *Page 260 
 conveyed to [Tenet] hereunder and the corresponding right to provide hospital services associated therewith (the `[Foundation] Beds') are conveyed to [Tenet] subject to the right of [the Foundation] to repurchase said [Foundation] Beds for a purchase price of $1.00, which option is hereby granted to [the Foundation], but which may be exercised by [the Foundation] as to any such beds only at such time as [the Foundation] is legally able to operate such beds to provide long term acute care services. During such time as such beds are owned by [Tenet], [Tenet] will continue to maintain the rights and benefits pertaining to said [Foundation] Beds and may use them in its hospital operations at the Hospital. Any [Foundation] Beds with respect to which [the Foundation] has not yet exercised its option are herein referred to as the `Option Beds.' In addition, [Tenet] will cooperate with [the Foundation] in having the Option Beds relicensed, recertified or relocated for long term acute care purposes at the Hospital or at other sites. Said cooperation will include joining with [the Foundation] in any regulatory applications and participating in any regulatory or other proceedings (all at [the Foundation's] sole cost and expense) that are deemed necessary by [the Foundation] to obtain said relicensing, recertification and relocation."
(Emphasis added.) Similarly, "Schedule 1.7(e)," entitled, "Leases," lists the Lease Agreement between Tenet and the Foundation and summarizes some of its essential terms, including the location and size of the premises, the commencement date and duration of the lease, and termination provisions.
 E. The Commencement of this Action
On February 11, 2000, Fairfield commenced this action in the Montgomery Circuit Court. The complaint, as last amended, sought a judgment declaring that the statutes and rules applicable to CONs prohibited the issuance of CONs to one owning only an option to purchase hospital beds, and that the Foundation's option to repurchase the Option Beds under the SPA was void and unenforceable. It also sought a temporary restraining order, enjoining SHPDA from issuing the CONs sought by the Foundation and from further considering the Foundation's CON applications.
On February 14, 2000, the trial court denied Fairfield's request for a temporary restraining order. The next day, Fairfield filed before SHPDA (1) a "Notice of Appeal" from the administrative law judge's recommended order; (2) a "Motion to Intervene"; (3) "Exceptions to Recommended Order for Contested Case Proceeding by Intervenor and Opponent, the City of Fairfield Healthcare Authority, Inc."; and (4) a "Motion to Stay." In those filings, Fairfield asserted essentially the same grounds set forth in its complaint in the Montgomery Circuit Court.
The Foundation filed a counterclaim against Fairfield. The counterclaim alleged that the Fairfield had, through its execution of the ASA, expressly assumed the obligations of the contracts between Tenet and the Foundation, namely, the obligations of the Lease Agreement, and of ¶ 15.4 of the SPA. The Foundation further alleged that Fairfield had breached its obligations by "engag[ing] in a plan or scheme to deprive [the Foundation] of its rights under the [SPA] and the [Lease Agreement]," including "the institution of this litigation," and the "attempt to intervene in the Certificate of Need proceeding pending before SHPDA." The Foundation sought damages, as well as a judgment ordering Fairfield specifically to perform the SPA and the Lease Agreement. *Page 261 
On February 23, 2000, SHPDA filed an "Answer, Counterclaim, Crossclaim and Request for Declaratory Relief." It framed its request for relief as follows:
 "45. The foregoing facts and circumstances present a number of justiciable controversies that exist between the parties as to their respective rights, duties, and liabilities arising from the CON statutes, SHPDA Rules and the AAPA, including the following:
 "A. Was the [administrative law judge] required to hold a formal `public hearing' prior to issuance of the Recommended Order under Ala. Code § 22-21-275(6) and Ala. Admin. Code r. 410-1-8-.02?
 "B. Does [Fairfield] have a right to intervene and file exceptions as a matter of law under Ala. Code § 41-22-14 and Ala. Admin. Code r. 410-1-9-.03?
 "C. If the answer to A and B is in the negative, does the Recommended Order automatically become law thirty days after its issuance, without the opportunity for CON Board Review?
 "46. A declaration of the rights and responsibilities of the parties at this stage is necessary to avoid unnecessary costs, delays and possible injury to either [the Foundation] or [Fairfield], depending on the resolution of the legal issues presented. For example, should the Court rule that [Fairfield] has a right to intervene as a matter of law and that SHPDA's CON Review Board must hold a hearing prior to a vote on the applications, such a proceeding could be held immediately, avoiding any further delays and the attendant evidentiary problems. On the other hand, should the Court rule that the [administrative law judge's] Recommended Order is due to become law automatically, SHPDA has no further role to play in regard to the aforementioned projects other than the ministerial task of formally issuing the CON."
On March 3, 2000, after the filings of the complaint, the counterclaims, and the cross-claim, SHPDA issued the CON for which Select had applied. Select was never made a party to this action.
On March 13, 2000, the Foundation filed a motion for a partial summary judgment. In that motion, the Foundation urged the court to hold, among other things, that it had standing to apply for the CONs, notwithstanding the fact that it owned only an option to purchase the Option Beds.
On June 23, 2000, the Foundation filed a second summary-judgment motion. The second motion asserted that the Foundation was entitled to a judgment as a matter of law on its counterclaim against Fairfield. More specifically, the motion sought a judgment holding:
 "(a) [that Fairfield] expressly assumed the obligation to resell 120 [Foundation Beds] to [the Foundation] as provided in the amended Stock Purchase Agreement with Tenet;
 "(b) [that Fairfield] also assumed the obligation to cooperate with [the Foundation] in having the [Foundation Beds] `relicensed, recertified or relocated for long-term acute care purposes at the [H]ospital or at other sites';
 "(c) [that Fairfield] assumed the five-year lease agreement to [the Foundation] for the operation of the [Foundation Beds]; and
 "(d) [that Fairfield] is in substantial breach of the foregoing obligations."
On September 1, 2000, the Foundation filed a third summary-judgment motion. In that motion, the Foundation alleged that "SHPDA's decision to issue the March 3, 2000, CON to Select[, while withholding] CONs from [the Foundation], was *Page 262 
arbitrary, capricious and without reasonable justification." It sought a judgment "ordering SHPDA to issue the two CONs to [the Foundation], or in the alternative, rescinding the CON issued to Select."
On September 7, 2000, Fairfield filed its own summary-judgment motion. It sought a judgment holding (1) that Fairfield had a right to intervene in the CON application process and to file exceptions to the recommended order; (2) that its intervention was timely; (3) that the recommended order could not become a final order without a public hearing and review by the SHPDA CON Review Board; (4) that the "Recommended Order [was] invalid because [the] Foundation's applications were false, misleading and fraudulently deceitful in asserting that Foundation was in fact the owner of the acute care beds sought to be reclassified and relocated"; (5) that the "Foundation was without standing to apply for a certificate of need to reclassify and/or relocate the acute care hospital beds" to which its only colorable claim of ownership was a purchase option; (6) that the Foundation had no standing to apply for the CONs, unless it applied "jointly in the names of [Fairfield] as owner and [the] Foundation as proposed purchaser and operator of the beds"; (7) that the Lease Agreement was not enforceable, being a mere "agreement later to agree"; and (8) that Fairfield never "assume[d] the obligation to retransfer ownership of up to 120 of its licensed acute care beds to [the Foundation]."
On October 18, 2000, the trial court denied the Foundation's three motions. It specifically held that, because Select was never made a party to the action, the court "was without jurisdiction to set aside Select's CON."
The court granted in part and denied in part Fairfield's motion, holding that the Foundation's applications were invalid and would "not support Certificate of Need review." More specifically, it concluded that the Foundation, being the owner only of an option to purchase the disputed beds, not of the beds themselves, did not have statutory authority to apply for the CONs. It further concluded that the applications could "only be filed either in the name of the owner or jointly with the owner of the facility or the beds." Thus, it held that the Foundation lacked standing to "file the applications seeking to reclassify and in part relocate acute-care hospital beds of which it was not the owner."
Although it held that there was "a genuine dispute of material fact . . . with regard to any assumption by [Fairfield] of the obligations of Tenet to [the Foundation] to sell the 120 beds," the court, nevertheless, also held that Fairfield was entitled to, and did, timely intervene and file exceptions in the Foundation's application process. In that connection, it also held (1) that, because the CON applications were a "contested case," the administrative law judge was required to hold a public hearing before entering the recommended order; (2) that Fairfield's intervention and filing prevented the recommended order from becoming a final order without a public hearing and review by the SHPDA CON Review Board; and (3) that, in any case, the Foundation's failure to state in its applications that it was not the owner of the beds was a misrepresentation, "sufficient to invalidate the applications for review by SHPDA."
Subsequently, Fairfield moved to dismiss its remaining claim, which had sought a declaration that the "option interest claimed by [the Foundation was] not valid and enforceable as against [Fairfield]." On January 2, 2001, the trial court dismissed the action without prejudice. The court characterized the relief sought by Fairfield in its remaining claim as *Page 263 
"no more than an advisory opinion." From that judgment, the Foundation appealed.[3] That appeal from a pretrial final judgment disposing of all claims in the case (as distinguished from a Rule 54(b) summary judgment disposing of fewer than all claims) entitles the Foundation, for purposes of our review, to raise issues based upon the trial court's adverse rulings, including the denial of its summary-judgment motions. See Ala.R.App.P. 4(a)(1).
 II. Issues
The Foundation's first two summary-judgment motions raise a number of the same issues presented in Fairfield's summary-judgment motion. Thus, for ease of discussion, we will address the common issues in separate sections of this opinion under the heading of each of the Foundation's three motions. However, the Foundation also challenges the conclusions of the trial court in its summary judgment in favor of Fairfield in three respects peculiar to Fairfield's motion. First, it contends that Fairfield's intervention was untimely. Second, it argues that the trial court erred in holding that the Foundation was guilty of such a misrepresentation as to void the applications.[4] Third, it insists that the trial court erred in holding that the recommended order was invalid because it was not preceded by a public hearing. Our disposition of the issues arising out of the denial of the Foundation's first two summary-judgment motions effectively resolves the additional issues presented in Fairfield's motion.
 A. The First Summary-Judgment Motion
We first address the Foundation's contention that it had standingunilaterally to apply for the CONs, that is, without joining the "owner" of the beds in the application. On this point, Fairfield argues:
 "[The Foundation] was without standing to apply for certificates of need to reclassify and/or relocate the acute care hospital beds of which it was not the owner. Being the mere holder of an option (even assuming the option is valid and enforceable) does not vest [the Foundation] with standing to petition for a certificate of need. This is especially so since [the Foundation's] right to exercise that option to repurchase up to 120 acute care beds was conditioned upon [the Foundation's] being `legally able to operate said . . . Beds to provide long-term acute care services.'"
Brief of Appellee, at 26-27. At a minimum, Fairfield argues, the Foundation lacked standing, because it "fail[ed] to file in the name of, or at least to join, the owner in the applications."[5] Id. at 26. Essentially, Fairfield's argument is that *Page 264 
the Foundation is in a "catch-22" position — Fairfield is not obligated to sell the beds until the Foundation acquires the legal authority to operate them through the issuance of the CONs; yet the Foundation has no standing to apply for the CONs until Fairfield sells it the beds.
In opposition to this argument, the Foundation contends that "neither the CON statutes nor the CON Rules contain any requirement that a CON applicant own the new health service or major medical equipment for which it is seeking approval through the CON process."[6] Brief of Appellant, at 69. Our review of the CON statutes and rules convinces us that the Foundation's position is correct.
The SHPDA CON review and application procedures are governed by Ala. Code 1975, § 22-21-260 et seq., and by the SHPDA rules promulgated pursuant to those sections. Section 22-21-265 provides, in pertinent part:
 "(a) On or after July 30, 1979, no person to which this article applies shall acquire, construct, or operate a new institutional health service, as defined in this article, or furnish or offer, or purport to furnish a new institutional health service, as defined in this article, or make an arrangement or commitment for financing the offering of a new institutional health service, unless the person shall first obtain from the SHPDA a certificate of need therefor."
Ala. Admin. Code r. 410-1-2-.19 defines "certificate of need" as follows:
 "A permit required by law before which no person, except as exempted by statute, shall acquire, construct or operate a new institutional health service or acquire major medical equipment, or furnish or offer, or purport to furnish a new institutional health service, or make arrangement or commitment for financing the offering of the new institutional health service or acquiring the major medical equipment."
The requirements of the statute and the agency rule are functionally identical and remarkable — no one may "acquire, . . . offer, or purport to furnish a new institutional health service, . . . or make anarrangement . . . for financing [such] offering" without "first
obtain[ing]" a CON. (Emphasis added.) The term "acquisition" "include[s] obtaining the legal equitable title to a freehold or leasehold estate or otherwise obtaining the substantial benefit of such titles or estates, whether by purchase, lease, loan or sufferance, gift, devise, legacy, settlement of a trust or means whatever, and . . . include[s] any act of acquisition." Ala. Admin. Code r. 410-1-2-.10; see also § 22-21-260(1), Ala. Code 1975.
Fairfield cites no statutory or administrative authority for the proposition that the Foundation lacked standing because it failed to acquire legal title to the beds before it filed its CON applications. Indeed, in clear and unambiguous terms, both the Legislature and SHPDA have prohibited the acquisition of a "new institutional health service," or of "major medical equipment" before obtaining a CON. Thus, far fromrequiring the procedure Fairfield advocates, the applicable authorityprohibits it. Similarly, Fairfield has cited no statute or administrative rule requiring a CON applicant to join anyone, such as an anticipated vendor, in the application process, and we have found none.
We hold that the Foundation had standing unilaterally to apply for the CONs in *Page 265 
its own name. The trial court erred, therefore, in denying the Foundation's first summary-judgment motion, to the extent it sought to establish that the Foundation had standing to apply for the CONs.
 B. The Second Summary-Judgment Motion
We next consider whether the trial court erred in denying the Foundation's second summary-judgment motion. That motion sought to establish that Fairfield expressly assumed the obligations of the SPA,¶ 15.4 as amended, "to resell 120 [Foundation Beds] to [the Foundation]," and to "cooperate with [the Foundation] in having the [Foundation Beds] `relicensed, recertified or relocated for long-term acute care purposes at the [H]ospital or at other sites.'" It also sought to establish that Fairfield expressly assumed the Lease Agreement. Finally, it sought to establish that Fairfield had breached its obligations under both agreements. We first address whether the SPA is enforceable against Fairfield.
(1) Enforceability of the SPA
This Court has stated:
 "As a general rule, where one company sells or otherwise transfers all its assets to another company, the transferee is not liable for the debts and liabilities of the transferor unless (1) there is an express agreement to assume the obligations of the transferor, (2) the transaction amounts to a de facto
merger or consolidation of the two companies, (3) the transaction is a fraudulent attempt to escape liability, or (4) the transferee corporation is a mere continuation of the transferor."
Andrews v. John E. Smith's Sons Co., 369 So.2d 781, 785 (Ala. 1979) (emphasis added). The issue, more precisely stated, is whether Fairfield, through the ASA, expressly assumed the obligations of ¶ 15.4 of the SPA. Fairfield contends that "[t]he clear language of the [ASA] between Tenet and [Fairfield] demonstrates that there was no such assumption of Tenet's obligations by [Fairfield]." Brief of Appellee, at 44 (emphasis added). More specifically, Fairfield states: "[T]he only contracts transferred to [Fairfield] by Tenet and assumed by [Fairfield] . . . were those contracts and agreements `with respect to the operation of the Hospital.' The purported option for repurchasing up to 120 beds isnot a contract `with respect to the operation of the Hospital.'" Id. at 45 (emphasis added). For a number of reasons, this argument has no merit.
First, the argument that the use of hospital beds by patients requiring long-term-acute care is not a transaction "with respect to the operation of the Hospital" is not persuasive. Such transactions are the essence of "the operation of a Hospital." Indeed, Fairfield concedes as much, elsewhere in its brief, where it states: "Prior to [the Foundation's] filings of these present applications . . ., [it] had sold to Tenet the Hospital and substantially all of its assets relating to the operation ofthe Hospital, including its 319 acute care hospital beds and the accompanying CON(s)." Brief of Appellee, at 18 (emphasis added).
Second, the ASA clearly and unambiguously provides that Fairfield assumed the obligations of Tenet. For example, under § 1.9 of the ASA, Fairfield expressly "assume[d] and agree[d] to discharge" the "Contracts." The term "Contracts" is defined in § 1.7(f) as "all contracts and agreements . . . with respect to the operation of the Hospital . . . including, without limitation, those Contracts describedin Schedule 1.7(f)." (Emphasis added.) Remarkably, Schedule 1.7(f) isprefaced with a reference to the SPA, ¶ 15.4. It states: "[Tenet's] obligations pursuant to its *Page 266 
covenant set forth in Amendment Number Two dated October 4, 1996 to that certain Stock Purchase Agreement between [Tenet] and [the Foundation], dated July 12, 1996, which provides as follows." Following that preface is an essentially verbatim reproduction of ¶ 15.4. Thus, the contract at issue in this case tops the list of contracts assumed by Fairfield as expressly set forth in Schedule 1.7(f) of the ASA.
Fairfield attempted to create an issue of fact as to whether it had assumed the SPA by offering the testimony of Larry Langford, chairman of Fairfield, and Mayor of the City of Fairfield. He testified by deposition as to his understanding of Fairfield's obligations. It is well-settled, however, that "absent some evidence of fraud, mistake, or illegality," parties to a contract may not, by parol evidence, vary the terms of an unambiguous instrument. Environmental Sys., Inc. v. Rexham Corp.,624 So.2d 1379, 1381 (Ala. 1993); see also Bussey v. John Deere Co.,531 So.2d 860, 862 (Ala. 1988). Whether a contract is ambiguous is a question of law for the court. Terry Cove North, Inc. v. Baldwin CountySewer Auth., Inc., 480 So.2d 1171, 1173 (Ala. 1985).
There was no ground on which to consider parol evidence in this case. Nor was there any ground for denial of the Foundation's second summary-judgment motion as it related to the SPA. Because it assumed the obligations of Amendment Two of the SPA, Fairfield was contractually bound to, among other things, "cooperate with [the Foundation] in having the Option Beds relicensed, recertified or relocated for long term acute care purposes at the Hospital or at other sites," so that the Foundation could, following the issuance of the CONs, purchase up to 120 beds from Fairfield. It breached its obligations to cooperate as a matter of law by commencing this action, and by attempting intervene in the contested case to oppose the Foundation's CON applications. We next address that aspect of the second summary-judgment motion relating to the enforceability of the Lease Agreement.
(2) Enforceability of the Lease Agreement
In its second summary-judgment motion, the Foundation also sought a judgment holding that Fairfield had assumed the Lease Agreement, and that it had breached that agreement. We have no difficulty in concluding as a matter of law that Fairfield assumed the obligations under the Lease Agreement. Indeed, Fairfield effectively concedes that it assumed the Lease Agreement. Brief of Appellee, at 46. It challenges the enforceability of the Lease Agreement, however, on another ground, arguing that the Lease Agreement is not an "agreement," but merely an "agreement to later agree." Brief of Appellee, at 29. For this proposition, it relies on ¶ 2.3, which provides:
 "In the event the Notice Date shall not have occurred on or before March 31, 1998, neither party shall be bound by the location of the Premises or the amount of rent established by the terms of this lease, and the location of the Premises and the amount of rent shall accordingly be subject to renegotiation at the option of either party. In the event the Notice Date shall not have occurred on or before March 31, 2001, this lease shall be null and void and of no further force and effect."
(Emphasis added.) Fairfield asserts that the Foundation failed to invoke the Lease Agreement before March 31, 1998, the first notice date; that failure, it argues, rendered certain provisions negotiable "at the option of either party." Thus, it argues, the Lease Agreement constitutes, at best, no more than an unenforceable *Page 267 
"agreement to agree" in the future. In any event, the Lease Agreement wasvoided, Fairfield contends, by the Foundation's failure to give notice on or before March 31, 2001, the final notice date. We disagree with these contentions.
At the outset of our discussion of this issue, we note that the Lease Agreement and Amendment Two were executed the same day. "[T]wo or more instruments executed contemporaneously by the same parties in reference to the same subject matter constitute one contract and should be read together in construing the contract." Haddox v. First Alabama Bank ofMontgomery, N.A., 449 So.2d 1226, 1229 (Ala. 1984).
We further acknowledge the general principle that "agreements to later agree are not enforceable." Clanton v. Bains Oil Co., 417 So.2d 149, 151
(Ala. 1982). However, that principle has no application here. The clause upon which Fairfield relies gives either party the option of renegotiating certain terms. In other words, agreement as to those terms already exists. The Foundation has not exercised its option. It would be anomalous to permit Fairfield to revoke the option and then to declare there is no agreement as to important terms, thereby rendering the agreement void in the face of its obligations under ¶ 15.4. In ¶ 15.4, the Foundation and Tenet agreed that Tenet would "cooperate with [the Foundation] in having the Option Beds relicensed, recertified or relocated for long term acute care purposes at the Hospital or at other sites" (emphasis added) (hereinafter referred to as the "cooperation clause"). This cooperation clause vests the Foundation with the right — at its option — to operate all 120 of the Option Beds at the Hospital, subject only to certification from SHPDA. Conversely, it encumbers Fairfield with the obligation to make available to the Foundation such space as is reasonable and necessary for the use of the beds. It necessarily follows from the cooperation clause that Fairfield will lease the Premises, will act in good faith in doing so, and will not invoke other provisions of the agreement merely to defeat its obligations under the cooperation clause. Thus, the parties do not have an agreement merely to agree later; they have an agreement.
"Where a contract fails to specify all the duties and obligations intended to be assumed, the law will imply an agreement to do those things that according to reason and justice the parties should do in order to carry out the purpose for which the contract was made." Sellersv. Head, 261 Ala. 212, 217, 73 So.2d 747, 751 (1954). "`There is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract; . . . in every contract there exists an implied covenant of good faith and fair dealing.'" Id.
We conclude, therefore, that the Lease Agreement, which was executed to facilitate the SPA, ¶ 15.4, is valid and enforceable against Fairfield, notwithstanding the lapse of the first "notice provision" in ¶ 2.3. To hold otherwise would allow Fairfield to hold the SPA "hostage" to the lapsed provision in the Lease Agreement.[7] *Page 268 
It does not follow from this discussion, however, that the trial court erred in denying the Foundation's summary-judgment motion on its claim for breach of the Lease Agreement. This is so, because the Foundation has offered no proof of a breach of the Lease Agreement. On the contrary, March 31, 1998, passed without the CONs having been attained, which was a condition precedent to the exercise of the provisions of ¶ 2.3. Consequently, through no fault of Fairfield, the rent provision has lapsed, and, by the clear terms of ¶ 2.3, neither party is currently bound. What is binding is the duty to renegotiate in good faith, upon theoccurrence of the condition precedent.
Our conclusions as to the second summary-judgment motion may be summarized as follows: Fairfield is bound by the SPA, ¶ 15.4, and it has breached the cooperation clause as a matter of law. To the extent the trial court denied the Foundation's motion on this ground, it also erred. We further conclude that Fairfield is bound by the Lease Agreement, with this caveat — it is not in breach of that agreement. It is bound to renegotiate in good faith the "location of the Premises and the amount of rent." Thus, the trial court erred only in part in denying the second summary-judgment motion.
As we stated previously in this opinion, these conclusions necessarily resolve issues peculiar to Fairfield's summary-judgment motion. First, in view of our conclusion in Part II.B.(1) that the SPA is valid and enforceable against Fairfield, the trial court's error in holding that Fairfield had a right to intervene, and that the intervention was timely, is clear. Because Fairfield was obligated by the cooperation clause to assist and cooperate with the Foundation, it had no right to intervene in the contested case for the purpose of filing exceptions to the Foundation's applications.
Second, Fairfield is the only party in this action complaining about the Foundation's alleged misrepresentations on the letters of intent and the CON applications, the manner in which the recommended order was entered, and the finality of that order. Because Fairfield had no right to intervene or to otherwise obstruct the certification process, it had no standing to challenge the alleged misrepresentation. It also had no standing to challenge the manner in which the recommended order was entered — that is, without a public hearing — or its finality. The trial court erred, therefore, in considering those issues. Consequently, we do not consider them. The trial court erred, therefore, in granting Fairfield's summary-judgment motion. We now consider the Foundation's third summary-judgment motion.
 C. The Third Summary-Judgment Motion
In its third summary-judgment motion, the Foundation sought to establish that "SHPDA's decision to issue the March 3, 2000, CON to Select[, while withholding] CONs from [the Foundation], was arbitrary, capricious and without reasonable justification," and it requested a judgment "ordering SHPDA to issue the two CONs to [the Foundation], or in the alternative, rescinding the CON issued to Select." The trial court did not err in denying this motion, for at least two reasons. First, Select was a necessary party to any such relief, and it was never made a party to this action. Second, and more fundamentally, *Page 269 
SHPDA is not refusing to issue the CONs. It has only deferred doing so, pending judicial resolution of the issues presented by Fairfield's attempted intervention and opposition to the applications. Brief of SHPDA, at 15. In doing so, it has not acted arbitrarily.[8]
The judiciary of Alabama will not order officials or agencies of the executive branch to do that which, for all that appears, they stand readyto do. See Siegelman v. Alabama Ass'n of School Bds., 819 So.2d 568
(Ala. 2001). Indeed, the issues presented in the Foundation's third summary-judgment motion are mooted by our disposition of the issues in the first two summary-judgment motions. For these reasons, the trial court did not err in denying the Foundation's third summary-judgment motion.
 III. Summary
In conclusion, the summary judgment in favor of Fairfield and the final judgment dismissing the action are reversed, and the cause is remanded for further proceedings consistent with this opinion. On remand, the trial court is directed to grant the Foundation's first summary-judgment motion, and to grant in part the Foundation's second summary-judgment motion, with the caveat expressed in Part II.B.(2) of this opinion.
REVERSED AND REMANDED WITH DIRECTIONS.
Houston, Lyons, Brown, Johnstone, Harwood, and Stuart, JJ., concur.
Moore, C.J., dissents.
See, J., recuses himself.
[1] "Long-term acute care beds are used to serve generally elderly and chronically ill patients who experience hospital stays greater than 25 days." (C. at 48.)
[2] In its letters of intent, the Foundation stated: "The Foundation is neither buying nor leasing beds as a part of this project." Also, the application forms the Foundation submitted contained blanks requesting: "Name of Legal Owner (if different from [applicant])." Those blanks were not filled in.
[3] As for SHPDA, its "counterclaim" and "cross-claim" were not "claims" in the functional sense of the word, but were, in effect, requests for an advisory opinion. Moreover, the October 18, 2000, judgment answered the questions as they relate to the Foundation and Fairfield. SHPDA has not appealed any aspect of the judgment, and, on appeal, has taken the position of appellee. The January 2, 2001, judgment dismissing the action, effectively disposed of all claims.
[4] This argument is based on the statements in the Foundation's letters of intent and on the manner in which the Foundation completed its application forms. See note 2, supra.
[5] Fairfield essentially argues that the only valid procedure would have been for it and the Foundation to join in the application process, as did Baptist and Select, which are situated similarly to Fairfield and the Foundation, respectively, in Select's CON application. Of course, Fairfield has demonstrated that, unlike Baptist's, its joinder would not have been forthcoming.
[6] On appeal, SHPDA does not address the issue of the Foundation's standing to apply for the CONs.
[7] In this connection, we reject Fairfield's argument that the Lease Agreement has failed in toto, because the Foundation did not invoke its provisions before March 31, 2001. For all that appears, the Foundation missed that deadline only because of Fairfield's actions. It is well-settled in Alabama and elsewhere that a party may not "benefit from his own wrongdoing." Alfa Life Ins. Corp. v. Culverhouse, 729 So.2d 325,327 (Ala. 1999); see American Life Ins. Co. v. Anderson, 246 Ala. 588,21 So.2d 791 (1945); Rasmussen v. Lee, 276 Mont. 84, 916 P.2d 98 (1996);Vasquez v. State, 680 S.W.2d 626 (Tex.Ct.App. 1984).
[8] An "arbitrary" action is one taken "[w]ithout fair, solid, and substantial cause; that is, without cause based upon the law . . . not governed by any fixed rules or standard." Black's Law Dictionary 104 (6th ed. 1990). On appeal, SHPDA presents only one argument, namely, that, because of the litigation commenced by Fairfield, SHPDA has not acted arbitrarily in postponing the issuance of the CONs, pending judicial review.