PITTMAN, Judge.
Select Specialty Hospitals, Inc., doing business as Select Specialty LTCH-Bir-mingham (“Select”), appeals from a judgment of the Montgomery Circuit Court affirming a decision of the State Health Planning and Development Agency (“SHPDA”) to issue a modification of a certificate of need (“CON”) to Noland Health Services, Inc. (“Noland”). We reverse the circuit court’s judgment and remand the cause with instructions.

Factual and Procedural Background

In 2002, SHPDA issued a CON authorizing Noland to convert 55 acute-care hospital beds in Lloyd Noland Hospital to long-term acute-care hospital (“LTACH”) beds,[1] with the converted beds to become a “hospital-within-a-hospital” located on the premises of Lloyd Noland Hospital in Jefferson County. In 2009, Noland (which, as *478 explained herein, had not yet undertaken the LTACH-bed conversion authorized by the CON) sought a modification of the CON to locate the converted LTACH beds at a hospital in Shelby County. Select intervened in the proceeding, opposed the proposed modification, and requested a fair hearing. The fair-hearing officer recommended that SHPDA grant Noland’s request for a modification of the CON. SHPDA issued the modification, and Select sought judicial review in the circuit court. The circuit court upheld SHPDA’s decision, after which Select filed a timely appeal in this court.
The circuit court’s judgment recited the facts and protracted procedural history of this case as follows:
“Noland was incorporated in 1951 for the charitable purpose of maintaining and operating a hospital or hospitals, nursing homes, medical clinics and other facilities in connection with furnishing medical services. For the next 45 years, Noland owned and operated Lloyd No-land Hospital, a 319-bed acute care hospital located in Fairfield, Alabama.
“In ... 1995, Noland filed a CON application with SHPDA requesting the reclassification of 100 acute care hospital beds located at Lloyd Noland Hospital [in Jefferson County] to 100 LTACH beds.... SHPDA’s CON Review Board denied Noland’s application on the basis that the then applicable State Health Plan did not provide for long term acute care hospital services in Alabama.
“As a denied applicant, Noland requested a fair hearing and the fair hearing officer ruled that the CON Review Board acted in an arbitrary and capricious manner in denying Noland’s application, reversed the decision of the CON Review Board, and remanded the matter to the Board for further proceedings consistent with his order.
“On July 15,1995, while the initial fair hearing was pending, Noland entered into a Stock Purchase Agreement (‘the SPA’) with Tenet Healthsystem Medical, Inc., a subsidiary of Tenet Healthcare Corporation (collectively, ‘Tenet’) pursuant to which Noland agreed to sell Lloyd Noland Hospital to Tenet....
“On September 10, 1996, the CON Review Board once again denied No-land’s CON application; therefore, No-land and Tenet amended Article XV of the SPA to add a new Section 15.4 which ... granted Noland the right to repurchase the beds for $1.00 once Noland received the authority to operate them as LTACH beds and required that Tenet ‘cooperate with [Noland] in having the “Option Beds” relicensed, recertified, or relocated for long term acute care purposes at the Hospital or at other sites.’
“After its sale of Lloyd Noland Hospital to Tenet, Noland appealed the denial of its CON application to the Circuit Court of Jefferson County, Alabama. While that appeal was pending, the 1996-99 State Health Plan included provisions addressing LTACHs. Thereafter, Noland and SHPDA reached a settlement whereby Noland agreed to dismiss its appeal in exchange for the right to reapply for CONs to reclassify 100 of the Section 15.4 ‘Option Beds’ as LTACH beds under the provisions of the newly revised State Health Plan.
“Pursuant to the settlement, on September 15, 1998, Noland filed a CON application with SHPDA requesting the reclassification of 55 acute care beds located at Lloyd Noland Hospital (subsequently renamed ‘HealthSouth Metro West’) to LTACH beds for the establishment of a 55-bed LTACH facility on the campus of Lloyd Noland Hospital (‘the Noland Project’). Birmingham Baptist *479 Medical Center-Montclair (‘Baptist-Montclair’) intervened in, and requested a contested case hearing with respect to, the Noland Project.
“On December 7, 1998, Select filed a CON application with SHPDA requesting the reclassification of 88 long term care beds located at and owned by Baptist-Montclair as LTACH beds for the establishment of a 38-bed LTACH on the campus of Baptist-Montclair (‘the Select Project’).[1] Noland intervened in, and requested a contested case hearing with respect to, the Select Project ....
“While the Noland Project and the Select Project were pending, Tenet and the City of Fairfield Healthcare Authority (‘FHA’) entered into an Asset Sale Agreement dated October 21, 1999 (‘the ASA’), pursuant to which Tenet agreed to sell Lloyd Noland Hospital to FHA. Pursuant to the ASA, FHA agreed to assume Tenet’s obligations to Noland contained in Section 15.4 of the SPA regarding the ... ‘Option Beds.’ Tenet and FHA closed the sale and purchase of Lloyd Noland Hospital on November 15, 1999, [and] FHA arranged for HealthSouth Corporation (‘Health-South’) to underwrite the purchase price of the Hospital, to manage the Hospital, and to provide the Hospital a line of credit to fund its cash needs.
“Thereafter, the parties to the Noland Project and the Select Project contested cases reached a settlement pursuant to which they agreed, among other things, to recommend to the administrative law judge that both the Noland Project and the Select Project be approved. Counsel for Noland and Select further stipulated that both the Noland Project and the Select Project were consistent with the 1996-1999 State Health Plan and satisfied all statutory and regulatory requirements for the issuance of the requested CONs. Noland and Select then filed a joint motion with the administrative law judge for an order recommending approval of the two projects, and on January 21, 2000, the administrative law judge issued a recommended order for contested case hearing recommending approval of the two projects....
“On February 11, 2000, FHA filed suit against SHPDA, SHPDA’s Executive Director, and Noland in the Circuit Court of Montgomery County, Alabama (the ‘FHA litigation’), seeking to enjoin SHPDA from issuing a CON for the Noland Project. Despite the fact that FHA had expressly assumed Tenet’s duty of cooperation contained in Section 15.4 of the SPA, FHA sought a declaration that Noland had no right to apply for the Noland CON because it did not own the beds to be reclassified, that Noland’s CON application was unauthorized and invalid, that Noland had no ownership in the beds, that Noland’s option to purchase the beds was null and void, and that SHPDA had no authority to consider Noland’s CON application ....
“Notwithstanding Select’s identical factual circumstances, on March 3, 2000, SHPDA issue a CON for the Select Project.
“On October 18, 2000, [Montgomery Circuit Judge Charles Price] entered a summary judgment in [favor of FHA in] the FHA litigation.... Noland appealed the judgment to the Alabama Supreme Court.
“On February 16, 2001, Noland filed suit against Tenet in the United States District Court for the Northern District of Alabama (the ‘Noland/Tenet litigation’), seeking damages from Tenet resulting from FHA’s interference with Noland’s CON application and the breach of the contract obligations of *480 Tenet which were assumed by FHA. Tenet filed a third-party complaint against FHA and HealthSouth, alleging that any interference by FHA and HealthSouth with the Noland Project was covered by indemnity obligations running to Tenet from FHA and Health-South, and seeking reimbursement of any damages incurred by Tenet as a result of the Noland/Tenet litigation.
“In defense of Noland’s claims, Tenet and HealthSouth asserted the same contentions made by FHA in the FHA litigation, i.e., that Noland did not have the right to apply for a CON because [it] did not own the beds.... [T]he same challenges to the validity of the Noland CON that were at issue in the FHA litigation were at issue in the No-land/Tenet litigation.
“On February 22, 2002, the Alabama Supreme Court ruled in favor of Noland in the FHA litigation, finding that
“ ‘[b]ecause [FHA] assumed the obligations of Amendment Two of the SPA, [FHA] was contractually bound to, among other things, “cooperate with [Noland] in having the Option Beds relicensed, recertified, or relocated for long term acute care purposes at the Hospital or other sites,” so that [Noland] could, following the issuance of the CONs, purchase ... [the] beds from [FHA]. [FHA] breached its obligations to cooperate as a matter of law, by commencing this action, and by attempting to intervene in the contested case to oppose [Noland’s] CON applications .... ’
“Lloyd Noland Foundation, Inc. v. City of Fairfield Healthcare Auth., 837 So.2d 253, 266 (Ala.2002). Thus, the Alabama Supreme Court cleared the way for SHPDA to issue the Noland CON and for FHA to transfer ownership of the 55 reclassified LTACH beds to Noland.[3]
“On June 28, 2002, SHPDA issued Noland CON 2004-LTACH authorizing the Noland Project.... [When FHA refused to transfer ownership of the beds to Noland, Montgomery Circuit Judge Charles Price] ordered FHA ‘to sell and transfer title to the 55 beds covered by CON 2004 to Noland forthwith.’
“On September 19, 2002, FHA transferred ownership of the 55 reclassified LTACH beds to Noland pursuant to a bill of sale containing invalid and unenforceable reversionary language that violated FHA’s assumed obligation of cooperation under § 15.4 of the SPA, as expressly interpreted by the Alabama Supreme Court and Montgomery Circuit Judge Price. The undisputed testimony provided at the fair hearing established that Noland continues to own the 55 LTACH beds.
“On October 15, 2003, FHA transferred HealthSouth Metro West (fik/a Lloyd Noland Hospital) and all related assets to HealthSouth in satisfaction of the debt owed by FHA to HealthSouth pursuant to the various agreements entered into in connection with FHA’s purchase of the hospital from Tenet.
“In July 2004, HealthSouth announced that it was closing Metro West in September 2004. Thereafter, on August 27, 2004, Noland filed suit against Health-South in the Circuit Court of Jefferson County, Alabama (the ‘Noland/Health-South litigation’). Though Noland’s complaint sought damages from Health-South, its primary thrust was to establish that (i) FHA was the alter ego or mere instrumentality of HealthSouth, (ii) all the obligations to Noland assumed by FHA when it bought Lloyd Noland Hospital from Tenet were binding on HealthSouth, and (iii) the Alabama Su *481 preme Court’s decision in the FHA litigation was binding and enforceable against HealthSouth.
“On or about September 1, 2004, HealthSouth closed HealthSouth Metro West as an acute care hospital.
“On March 30, 2005, Noland provided SHPDA a status report on the Noland Project in which it reported that the Noland CON was still involved in litigation, and SHPDA advised Noland, by letter dated April 18, 2005, that, ‘[i]nas-much as this project is in litigation, we will wait to hear from the Court before taking any further action.’ Noland provided SHPDA further updates regarding the litigation on August 1, 2006 and June 6, 2007.
“The Noland/Tenet litigation was finally tried to a jury in federal court in December 2008, resulting in a jury verdict in favor of Noland against Tenet and HealthSouth. While various post-trial motions were pending, the matter was finally resolved and an agreed order of dismissal was entered on May 21, 2009. By order dated May 29, 2009, the Noland/HealthSouth litigation also was resolved and all claims and causes of action were dismissed with prejudice.
“On November 2, 2009, Noland filed its request with SHPDA for the project modification, which was placed on the agenda for the November 18, 2009, meeting of the CON Review Board. On November 17, 2009, Select filed with SHPDA its notice of intervention and opposition with respect to the project modification.
“The project modification came before the CON Review Board at its November 18, 2009, meeting. After reviewing the documents of record and considering the presentations and arguments of Noland and its counsel, Shelby Baptist, and Select’s counsel, the CON Review Board unanimously approved the project modification. The undisputed testimony of the President of Shelby Baptist before the CON Review Board was that there was an unmet need for LTACH services in Shelby County. On December 3, 2009, the CON Review Board issued its ruling approving the project modification, and SHPDA issue[d] Noland CON 2004-LTACH-Ext-Mod #1, Mod #2.
“On December 17, 2009, Select filed with SHPDA its request for [a] fair hearing with respect to the CON Review Board’s approval of the project modification. SHPDA appointed the Honorable P. Michael Cole as the fair hearing officer (‘FHO Cole’). Following the fair hearing, FHO Cole entered an order approving the project modification, which approval became the final order of SHPDA pursuant to Ala.Code 1975, § 22-21-275(14) and Ala. Admin. Code Rule 410-1-8-.25.
“Although Select had previously filed a protective appeal from the December 3, 2009, final order of the CON Review Board approving the project modification (CV-10-900124), Select filed with SHPDA a second notice of appeal appealing FHO Cole’s approval of the project modification and filed with this court a second petition for judicial review (CV-10-900802) with its protective petition for judicial review (CV-10-900124) pursuant to Rule 42(a) of the Alabama Rules of Civil Procedure.
*482 (Some footnotes omitted.)

Standard of Review

In Colonial Management Group, L.P. v. State Health Planning and Development Agency, 853 So.2d 972, 974-75 (Ala.Civ. App.2002), this court set out the principles that apply to appellate review of an administrative agency’s action.
“This court reviews a trial court’s judgment regarding the decision of an administrative agency ‘without any presumption of its correctness, since [the trial] court was in no better position to review the [agency’s decision] than’ this court. State Health Planning & Res. Dev. Admin. v. Rivendell of Alabama, Inc., 469 So.2d 613, 614 (Ala.Civ.App.1985). Under the Alabama Administrative Procedure Act (‘AAPA’), § 41-22-1 et seq., Ala.Code 1975, which governs judicial review of agency decisions,
“ ‘[e]xcept where judicial review is by trial de novo, the agency order shall be taken as prima facie just and reasonable and the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact, except where otherwise authorized by statute. The court may affirm the agency action or remand the case to the agency for taking additional testimony and evidence or for further proceedings. The court may reverse or modify the decision or grant other appropriate relief from the agency action, equitable or legal, including declaratory relief, if the court finds that the agency action is due to be set aside or modified under standards set forth in appeal or review statutes applicable to that agency or if substantial rights of the petitioner have been prejudiced because the agency action is any one or more of the following:
“ ‘(1) In violation of constitutional or statutory provisions;
“ ‘(2) In excess of the statutory authority of the agency;
“ ‘(3) In violation of any pertinent agency rule;
“ ‘(4) Made upon unlawful procedure;
‘“(5) Affected by other error of law;
“ ‘(6) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
“ ‘(7) Unreasonable, arbitrary, or capricious, or characterized by an abuse of discretion or a clearly unwarranted exercise of discretion.’
“§ 41-22-20(k), Ala.Code 1975 (emphasis added). In reviewing the decision of a state administrative agency, ‘[t]he special competence of the agency lends great weight to its decision, and that decision must be affirmed, unless it is arbitrary and capricious or not made in compliance with applicable law.’ Alabama Renal Stone Inst., Inc. v. Alabama Statewide Health Coordinating Council, 628 So.2d 821, 823 (Ala.Civ.App.1993). ‘The weight or importance assigned to any given piece of evidence presented in a CON application is left primarily to the [Certificate of Need Review Board’s] discretion, in light of the [Certificate of Need Review Board’s] *483 recognized expertise in dealing with these specialized areas.’ State Health Planning & Dev. Agency v. Baptist Health Sys., Inc., 766 So.2d 176, 178 (Ala.Civ.App.1999). Neither this court nor the trial court may substitute its judgment for that of the administrative agency. Alabama Renal Stone Inst., Inc. v. Alabama Statewide Health Coordinating Council, 628 So.2d 821, 823 (Ala.Civ.App.1993). ‘This holds true even in cases where the testimony is generalized, the evidence is meager, and reasonable minds might differ as to the correct result.’ Health Care Auth. of Huntsville v. State Health Planning Agency, 549 So.2d 973, 975 (Ala.Civ.App.1989). Further, ‘an agency’s interpretation of its own rule or regulation must stand if it is reasonable, even though it may not appear as reasonable as some other interpretation.’ Sylacauga Health Care Ctr., Inc. v. Alabama State Health Planning Agency, 662 So.2d 265, 268 (Ala.Civ.App.1994).”

Discussion

Select contends that the circuit court erred in affirming SHPDA’s decision because, it says, Noland failed to establish that its project-modification request was consistent with the 1996-1999 State Health Plan (“SHP”) in several respects. Specifically, Select argues that Noland failed to introduce any evidence indicating (1) that there was a need, as determined by the need methodology outlined in the 1996-1999 SHP, for LTACH beds in Shelby County, (2) that it had the ability to “convert excess acute-care beds to long-term hospital beds” as required by the 1996-1999 SHP, and (3) that it had the “written patient transfer agreements” with other local hospitals required by the 1996-1999 SHP.
I. Need for LTACH Beds
The 1996-1999 SHP, which all parties agree is applicable to Noland’s project modification, established the following need methodology for long-term acute-care beds:
“The [LTACH] bed need for the area shall be no more than five (5) percent of the combined [average daily census] of all the acute-care hospitals in the county and contiguous counties.”
Former Rule 410-2-4-.02(7)(e)(2), Ala. Admin. Code (SHPDA).[2] Select asserts that the methodology requires a computation of the average daily census (“ADC”) of all hospitals in Shelby County and the counties contiguous to Shelby County but that the CON Review Board (“the CONRB”) erroneously considered the ADC of hospitals only in Jefferson and Shelby counties, thereby, Select says, ignoring the data from counties that are contiguous to Shelby but not contiguous to Jefferson County.
In response to Select’s argument, the fair-hearing officer determined the following:
“[T]he 1996-1999 State Health Plan ... established that the ‘need [for LTACH beds] for the area should be no more than five (5) percent of the combined ADC of all acute care hospitals in the county and contiguous counties.’ Ala. Admin. Code, Rule 410-2-4-.02(7)(e)2. Thus, the ‘planning area’ applicable to the Noland Project Modification is the county in which the LTACH is to be located and its contiguous counties. The Noland CON authorized the 55-bed LTACH in Jefferson County. Accordingly, the applicable planning area is Jefferson County and its contiguous *484 counties, which includes Shelby County.3 Thus, the modification is compliant with the 1996-1999 State Health Plan, CON Rule § 410-1-10-.03 and prior actions of the CON Review Board.
“This conclusion is consistent with the finding of the CON Review Board in its approval of the Noland Project Modification.
“ ‘Select also asserts that Noland may not use the project-modification rule to seek approval of a new location that falls outside of the health service area contained in the State Health Plan at the time of the original filing. However, for purposes of determining need for LTACHs, the 1996-1999 Alabama State Health Plan considered the need in contiguous counties, including Shelby County. The Board finds that the application, as modified, is not inconsistent with the State Health Plan in effect at the time of filing and that the change to Shelby County does not deprive the Board of the ability to approve the present request.’ (internal footnote omitted).
[[Image here]]
“In May 2008, after the enactment of the Medicare, Medicaid, and SCHIP Extension Act, 121 Stat. 2492, the Center for Medicare and Medicaid Services (‘CMS’) finalized rules regarding the establishment of new LTACHs after December 29, 2007. The practical effect of these rules is that health care providers that do not hold a CON for LTACH services issued prior to December 29, 2007, will not be allowed to establish an LTACH in the foreseeable future. The moratorium was imposed for a period of three years, but there is discussion that it may be extended.
“The CMS moratorium outlined in 42 C.F.R. § 412.23(e)(6) contains an exception for LTACHs that on or before December 29, 2007 ‘[h]ad obtained an approved certificate of need from the State, when required by State law.’ Id. at § 412.23(e)(6)(ii)(C): The Noland CON was issued by SHPDA on June 28, 2002, and thus qualifies for the exemption to the CMS moratorium. As found by the CON Review Board, ‘under current rules, Noland would thus be prevented from obtaining Medicare certification of the LTACH beds if it were required to file a new CON application instead of following the project-modification procedure.’ If the project is not allowed to proceed, the unmet LTACH needs in Jefferson County and its contiguous counties, including Shelby County, will go unmet.
“ “The 2004-2007 State Health Plan, which became effective November 22, 2004, changed the LTACH planning area from the county in which the LTACH was to be located and its contiguous counties, to eight specifically defined ‘regions.’ Both Jefferson County and Shelby County are in Region III, which also includes Bibb, Blount, Cull-man, Marion, Saint Clair, Talladega, Walker and Winston Counties. The similarity of Region III and the planning area applicable to the Noland Project under the 1996-1999 State Health Plan is striking. Six of the eight counties included in the planning area under the 1996-1999 State Health Plan (including both Jefferson and Shelby Counties) are included in Region III.”
The circuit court affirmed SHPDA’s order on this point, citing Brookwood Health Services, Inc. v. Baptist Health System, Inc., 936 So.2d 529, 537 (Ala.Civ.App.2005), and State Health Planning Agency v. Mobile Infirmary Ass’n, 608 So.2d 1372, 1375 (Ala.Civ.App.1992) (both stating that “the [SHP] guidelines are merely a set of crite *485 ria used in processing applications and [SHPDA] is entitled to exercise its discretion in following these guidelines”).
“Our review is limited to questions of whether the agency exceeded its statutory authority, whether its decision was supported by substantial evidence, and whether its action was arbitrary. State Health Planning Agency v. Mobile Infirmary, 533 So.2d 255 (Ala.Civ.App.1988); Alabama Board of Nursing v. Herrick, 454 So.2d 1041 (Ala.Civ.App.1984). As long as the agency action is rational and reasonably justified, it cannot be classified as arbitrary or capricious. Waters v. City & County of Montgomery Personnel Board, 507 So.2d 951 (Ala.Civ.App.1986). Furthermore, an agency’s interpretation of its own rule or regulation must stand if it is reasonable, even though it may not appear as reasonable as some other interpretation. Ferlisi v. Alabama Medicaid Agency, 481 So.2d 400 (Ala.Civ.App.1985).”
Sylacauga Health Care Ctr., Inc. v. Alabama State Health Planning Agency, 662 So.2d 265, 268 (Ala.Civ.App.1994).
We conclude that SHPDA’s interpretation of the SHP and its determination that Noland’s project modification was consistent with the SHP requirements were reasonable.
II. Ability to Convert Acute-Care Beds to LTACH Beds
Former Rule 410-2-4-.02(7)(c), Ala. Admin. Code (SHPDA), a part of the 1996-1999 SHP, provided, in pertinent part:
“(c) Alabama has an excess of 7,185 general acute-care hospital beds, some of which could be used for long-term hospital care. Therefore, a general acute-care hospital may apply for a certificate of need to convert excess acute-care beds to long-term hospital beds if the following conditions are met .... ”
Select maintains that Noland cannot comply with the SHP requirement to “convert excess general acute-care beds to [LTACH] beds” because, it says, Noland does not own any general acute-cáre hospital beds to convert. Select points out that the September 19, 2002, bill of sale from FHA to Noland conditioned the transfer of title to the beds upon Noland’s locating and operating the beds at Lloyd Noland Hospital in Jefferson County for five years, failing which condition the sale would “become null and void.” Select argues that, because Noland has not satisfied the condition, ownership of the beds-has reverted to FHA.
In Lloyd Noland Foundation, Inc. v. City of Fairfield Healthcare Auth., 837 So.2d 253 (Ala.2002) (a decision released on February 22, 2002), our supreme court stated:
“Because [FHA] assumed the obligations of Amendment Two of the SPA, [FHA] was contractually bound to, among other things, ‘cooperate with [Noland] in having the Option Beds reli-censed, recertified or relocated for long term acute care purposes at the Hospital or other sites,’ so that [Noland] could, following the issuance of the CONs, purchase [the] beds from [FHA]. [FHA] breached its obligations to cooperate as a matter of law, by commencing this action, and by attempting to intervene in the contested case to oppose [Noland’s] CON applications.... ”
837 So.2d at 266 (emphasis added). Subsequently, when FHA refused to transfer the beds to Noland, Montgomery Circuit Judge Charles Price entered an order compelling FHA to “sell and transfer title to the 55 beds covered by the CON to Noland forthwith.” The conditional-transfer and reverter provisions of the Septem *486 ber 19, 2002, bill of sale were clearly invalid, as both the fair-hearing officer and the circuit court recognized. Moreover, neither FHA nor HealthSouth opposed No-land’s project modification based upon an assertion of ownership in the beds. Only Select, which has no interest in the beds, has asserted that Noland does not own the beds.
III. Patient Transfer Agreements
The 1996-1999 SHP provided, in former Rule 410-2-4-.02(7)(c)3. and 4., Ala. Admin. Code (SHPDA), that an applicant .for a CON to convert excess acute-care beds to LTACH beds must establish that it
“3.... has written patient transfer agreements with hospitals other than the host hospital to provide at least 75 percent of the admissions to the long-term hospital, based on the total average daily census for all participating hospitals [and that]
“4. [t]he transfer agreements are with other hospitals in the county and/or with hospitals in contiguous counties.”
In support of its 1998 CON application, Noland submitted letters of support from seven area hospitals that, Noland said, were “indicative of transfer agreements to be executed upon SHPDA’s approval of [the CON].” The seven letters were signed by representatives of Bessemer Carraway Medical Center, Blount Memorial Hospital, Brookwood Medical Center, Carraway Methodist Medical Center, Eastern Health System, St. Clair Regional Hospital, and the University of Alabama at Birmingham (“UAB”) Hospital.
During contested-case proceedings in 2010, Select first argued that the letters did not constitute “written patient transfer agreements,” within the meaning of former Rule 410-2-4-.02(7)(c)3., because they merely expressed support for Noland’s project and did not refer to any agreements to transfer patients to Noland’s proposed LTACH. Next, Select argued that, even if the letters could be deemed to be “indicative” of future transfer agreements, Noland could not rely on the same letters that it had submitted 11 years earlier to satisfy subsections 3. and 4. of former Rule 410-2-4-.02(7)(c) because, Select said, the evidence indicated that five of the seven hospitals referenced in the 1998 letters had been sold, had ceased to exist, or were operating under new management by 2009.
At the fair hearing, Select elicited evidence indicating that Bessemer Carraway Medical Center was currently being operated by UAB Medical Center West; that Blount Memorial and St. Clair Regional Hospitals were currently being operated by St. Vincent’s Health System (and, further, that St. Clair Regional Hospital was not located in a county that is contiguous to Shelby County); that Carraway Methodist Medical Center had closed; and that the letter from Eastern Health System pertained to a different CON, Noland’s 45-bed LTACH project that was to be located at Medical Center East. Thus, Select says, only two of the letters — those from Brook-wood Medical Center and UAB Hospital— “could even conceivably still be valid” in determining whether Noland had “written patient transfer agreements with hospitals other than the host hospital to provide at least 75 percent of the admissions to the long-term hospital, based on the total average daily census for all participating hospitals.”
At the fair hearing, Noland argued that, during the contested-case proceedings in 1999 when SHPDA had been considering the CON applications of both Noland and Select, Select had stipulated that, “with respect to the Noland Project, Noland has written transfer agreements with hospitals *487 in Jefferson County or in contiguous counties other than the host hospital,” and, Noland maintained, Select was bound by that stipulation. Noland also argued that the doctrine of collateral estoppel barred relitigation of the transfer-agreement issue. We disagree, both that Select was bound by its stipulation made in 1999 and that the doctrine of collateral estoppel barred relitigation of the transfer-agreement issue in 2009.
In construing a stipulation, a reviewing court may look to “the language used in the entire agreement in light of the surrounding circumstances.” 73 Am. Jur.2d Stipulations § 6 at 536 (2012). A party may be relieved of a stipulation on the grounds “that it was entered into as a result of fraud, misrepresentation, mistake of fact, or excusable neglect, or that the facts have changed, or that there is some other special circumstance rendering it unjust to enforce the stipulation.... ” Rutili v. O’Neill (In re O’Neill), 468 B.R. 308, 337 (Bankr.N.D.Ill.2012) (emphasis added).
“It is ... generally recognized that relief may be had from a stipulation where there has been a change in conditions or unforeseen developments which would render its enforcement inequitable provided that there has been diligence in discovering the facts relative to the disputed matter, the application is timely, and the opposing party has not so changed his or her position as to be prejudiced to a greater extent than the applicant.”
73 Am.Jur.2d Stipulations § 13 at 547. We conclude (a) that the evidence indicated that circumstances affecting the hospitals whose representatives had sent letters of support to Noland in 1998 had changed by 2009, (b) that all parties were aware of those changes, and (c) that relieving Select from its 1999 stipulation would have prejudiced Noland to a lesser extent than binding Select to its 1999 stipulation prejudiced Select.
We also conclude that the doctrine of collateral estoppel does not apply to Select’s stipulation.
“ ‘In order for the doctrine of collateral estoppel to apply to an issue raised in an administrative proceeding, the following elements must be present:
“ ‘ “ ‘(1) there is identity of the parties or their privies; (2) there is identity of issues; (3) the parties had an adequate opportunity to litigate the issues in the administrative proceeding; (4) the issues to be estopped were actually litigated and determined in the administrative proceeding; and (5) the findings on the issues to be estopped were necessary to the administrative decision.’ ” ’
“Ex parte Smith, 683 So.2d 431, 433 (Ala.1996) (quoting Ex parte Shelby Med. Ctr., Inc., 564 So.2d 63, 68 (Ala.1990) (quoting Pantex Towing Corp. v. Glidewell, 763 F.2d 1241, 1245 (11th Cir.1985))).”
Hale v. Hyundai Motor Mfg. Alabama, LLC, 86 So.3d 1015, 1023 (Ala.Civ.App.2012) (quoting Wal-Mart Stores, Inc. v. Smitherman, 743 So.2d 442, 445 (Ala.1999), overruled on other grounds by Ex parte Rogers, 68 So.3d 773 (Ala.2010)).
The second and fourth elements of collateral estoppel are missing in this case. The second element, identity of issues, does not exist because the 1999 proceeding concerned whether Noland and/or Select was entitled to a CON for the conversion of acute-care beds to LTACH beds in Jefferson County, whereas the instant proceeding concerned whether Noland, having previously been issued a CON for the conversion of acute-care beds to LTACH beds in Jefferson County, was entitled to have the CON modified to allow for the same *488 project in Shelby County. The fourth element, that “the issue[] to be estopped [was] actually litigated and determined in the administrative proceeding,” is also missing. The first administrative proceeding was essentially resolved by a consent judgment following a settlement between Noland and Select, based on the parties’ stipulation that both the Noland project and the Select project were consistent with the 1996-1999 SHP and satisfied all statutory and regulatory requirements for the issuance of the requested CONs.
In AAA Equipment & Rental, Inc. v. Bailey, 384 So.2d 107, 112 (Ala.1980), our supreme court held that a consent judgment based on stipulations of the parties “was entitled to no collateral estoppel effect because there was an absence of actual litigation between them as adversaries on the issues....” 384 So.2d at 112. In support of its holding that the actual-litigation requirement is not met when the prior proceeding results in a consent judgment based upon stipulations, the Bailey court cited Associates Capital Services v. Loftin’s Transfer & Storage Co., 554 F.2d 188 (5th Cir.1977), a decision that the Bailey court summarized as follows:
“Associates sued in Alabama to collect a debt. The defendant contended that the suit was barred because the plaintiff, an Indiana corporation, had failed to qualify to do business in Alabama. In an earlier case involving this plaintiff, the district court had held adversely to the plaintiff on the ‘doing business’ issue, and in this proceeding the defendant contended that the plaintiff was es-topped in the later case from litigating that issue. The Court of Appeals pointed out, however, that the former case had been remanded on appeal in accord with a stipulation of the parties, and settled in the plaintiffs favor. ‘Therefore,’ the court stated, ‘the decision of the district court spawned no prece-dential effect and renders nugatory the question of collateral estoppel.’ ”
Bailey, 384 So.2d at 112 (quoting Associates Capital Servs., 554 F.2d at 189). The court distinguished Wheeler v. First Alabama Bank of Birmingham, 364 So.2d 1190, 1199 (1978), stating that Wheeler had “involved two actions, in both of which the right to income from certain trusts was in issue. In the first suit that issue was actually litigated, that is, the judgment rendered in it was not based upon default, stipulation, or consent.” 384 So.2d at 112 (emphasis added).
In the present case, fair-hearing officer Michael Cole did not determine that the two letters of support signed by representatives of Brookwood Medical Center and UAB Hospital — the only hospitals whose circumstances had not changed since 1998 when the letters of support for the Noland project had been received — were sufficient, without considering the remaining five letters, to satisfy the “written-patient-transfer-agreement” requirement of former Rule 410-2-4-.02(7)(c)3., Ala. Admin. Code (SHPDA). Instead, Cole implicitly determined that all seven letters were pertinent to the issues before SHPDA in 2009 because those letters had been the subject of Select’s stipulation in 1999, and Select was bound by that stipulation.[3] In their appellate briefs, Noland and SHPDA do not suggest any reason for upholding the circuit court’s judgment as to the transfer agreements other than Select’s stipulation on that point.
*489 The fair-hearing officer’s order recommending that SHPDA grant Noland’s request for a modification of the CON became the final decision of SHPDA pursuant to § 22-21-275(14), Ala.Code 1975, and Rule 410-1-8-.25, Ala. Admin. Code (SHPDA). Insofar as that decision related to the transfer-agreement issue, the decision was not based upon the exercise of SHPDA’s discretion, either in assigning “weight or importance ... to any given piece of evidence” or upon SHPDA’s “recognized expertise in dealing with ... specialized areas,” State Health Planning & Dev. Agency v. Baptist Health Sys., Inc., 766 So.2d 176, 178 (Ala.Civ.App.1999). Thus, SHPDA’s decision as to the transfer-agreement issue was not entitled to deference by the circuit court, id., and the circuit court erred in affirming that decision because it was affected by an error of law. See § 41-22-10(k)(5), Ala.Code 1975.
Accordingly, we reverse the circuit court’s judgment and remand the cause with instructions to remand the matter to SHPDA for a determination as to whether the Brookwood Medical Center and UAB Hospital letters alone satisfy the requirement of former Rule 410-2-4-.02(7)(c)3., Ala. Admin. Code (SHPDA), that Noland had “written patient transfer agreements with hospitals other than the host hospital to provide at least 75 percent of the admissions to the long-term hospital, based on the total average daily census for all participating hospitals.”
REVERSED AND REMANDED WITH INSTRUCTIONS. .
THOMPSON, P.J., and BRYAN, THOMAS, and MOORE, JJ., concur.

. " ‘Long-term acute care beds are used to serve generally elderly and chronically ill patients who experience hospital stays greater than 25 days.’ " Lloyd Noland Found., Inc. v. City of Fairfield Healthcare Auth., 837 So.2d 253, 256 n. 1 (Ala.2002).

“ 1 The Noland Project and the Select Project were not mutually exclusive for at the time their respective CON applications were filed there was a need for 155 LTACH beds based on the combined average daily census of the acute care hospitals in Jefferson County and its contiguous counties, which includes Shelby County. The Noland Project (55 *482 LTACH beds), and the Select Project (38 LTACH beds), and a second Noland CON application (requesting 45 LTACH beds to be relocated to Medical Center East), only accounted for 138 of the 155 needed LTACH beds.

“ 3Even after the Alabama Supreme Court ruled in favor of Noland in the FHA litigation, Tenet and HealthSouth continued to assert the invalidity of the Noland CON in defense of Noland’s claims in the Noland/Tenet litigation.”

. Rule 410-2-4-.02 has been amended. For purposes of this opinion, we refer to Rule 410-2-4-.02 as it existed as part of the 1996-1999 SHP.

. Fair-hearing officer Cole noted that administrative-law judge M. Dixon Torbert, the fair-hearing officer in the 1999 proceedings, had "found the Noland Project to be consistent with the 1996-1999 State Health Plan.” In his order recommending that SHPDA grant the CON modification, Cole stated that he would "not now go behind the stipulations or the agreement just because Select no longer finds them to its liking.”